(82 N. W. Rep. 871.)

---

JOHN A. GARDNER vs. LOUIE S. GARDNER.

Opinion filed May 2, 1900.

**Divorce—Extreme Cruelty—Evidence.**

Action for a divorce. Evidence examined, and *held* that the allegations of extreme cruelty stated in the complaint as grounds for relief are not sustained by a preponderance of evidence.

**Recrimination—Condonation.**

> In actions for a divorce, where defendant's answer sets out causes of action for a divorce against the plaintiff in recrimination and as a defense to the plaintiff's causes of action, it is competent for the plaintiff to show at the trial that the causes of action pleaded in the answer have been condoned by the defendant. It is likewise competent for the defendant to show at the trial that the defendant, the forgiving party, has not, since the condonation, been treated with conjugal kindness by the plaintiff. If this fact is made to appear, the condonation is ineffectual, and the recrimination alleged by answer may, despite the condonation, be shown to defeat the plaintiff's action.

**Condonation Ineffectual as a Defense.**

> Evidence examined, and *held* that the condonation of the offenses set out in the answer as recrimination was not followed by conjugal kindness on plaintiff's part, and hence such condonation is ineffectual for any of the purposes of the case.

Appeal from District Court, Grand Forks County; *Morgan, J.*

Action by John A. Gardner against Louie S. Gardner. Judgment for plaintiff, and defendant appeals.

Reversed.

*Corbet & Murphy,* for appellant.

Evidence of statements and declarations of the injured party, made at the time or immediately after the commission of the wrongful act, where the party is laboring under great mental strain or excitement, indicating that the statements are made upon the impulse, without premeditation, are admissible as *res gestae* where the wrong complained of has been proven by other testimony. The corroborative evidence in this case, however, was not within the rule, but clearly hearsay. Nelson, on Div. & Sep. § § 109 and 321; *Huth* v. *Huth*, 30 S. W. Rep. 240. Plaintiff's evidence did not establish good faith in bringing this action, either as to the bona fides of his residence or in corroborative proofs. § § 2755 and 2757, Rev. Codes; *Graham* v. *Graham*, 9 N. D. 88, 81 N. W. Rep. 44. Mere rudeness of language, petulance of manner, austerity of temper, or even occasional sallies of passion, if they do not threaten bodily harm, do not constitute legal cruelty. *Dunn* v. *Dunn*, 42 N. W. Rep. 280; *Peavey* v. *Peavey*, 41 N. W. Rep. 67; *Gleason* v. *Gleason*, 19 N. W. Rep. 784; *Johnson* v. *Johnson*, 14 N. W. Rep. 670; *Burns* v. *Burns*, 60 Ind. 259; *Harper* v. *Harper*, 29 Mo. 301; Nelson on Div. & Sep. § § 286, 311, and 318. Appellant was provoked by respondent's conduct in causing his arrest. Having brought the difficulty upon himself, he cannot complain. Nelson on Div. & Sep. § 326; *McAllister* v. *Mc Allister*, 7 N. D. 324, 75 N. W. Rep. 256. There was strong evidence in the case that plaintiff had been guilty of adultery with Cara Weise and also with Celia Ryan. If everything was innocent and proper between plaintiff

and these parties his failure to produce them as witnesses upon the trial furnishes strong ground for distrusting plaintiff's evidence in denial of the charge. *Pond* v. *Pond,* 132 Mass. 219; *Bibby* v. *Bibby,* 33 N. J. Eq. 56; Nelson on Div. & Sep. § 194. For a year prior to the commencement of this action defendant had ceased her former course of conduct toward plaintiff, and plaintiff and defendant co-habited together during the last year. These circumstances amount to a condonation by him of all her previous offences. *Clague* v. *Clague,* 49 N. W. Rep. 198. It is not necessary to show an express agreement to condone. Condonation is inferred from the cohabitation. *Clague* v. *Clague,* 49 N. W. Rep. 198; *Williamson* v. *Williamson,* 1 Johns. Ch. 488; *Wood* v. *Wood,* 2 Paige 108; *Burns* v. *Burns,* 60 Ind. 259; *Harper* v. *Harper,* 29 Mo. 301, 5 Am. & Eng. Enc. L. 282. The evidence shows that all condonation and for-giveness by defendant was conditional only, the plaintiff having failed to take advantage of it, and mend his ways; but, on the contrary, kept going from bad to worse, any condonation that plaintiff might otherwise have taken advantage of has been waived or revoked. *Inskeep* v. *Inskeep,* 5 Ia. 204; *Names* v. *Names,* 25 N. W. Rep. 671.

*Ledru Guthrie* and *B. D. Towsend,* for respondent.

The cruelty imputed to the defendant is great irritability of temper producing ungovernable passion. Courts, in such cases, interfere with the divorce decree, not for the purpose of punishment for the wrong inflicted, but to place the person in a condition of security for the future. 1 Bish. M., D. & Sep. § 1536; *Morris* v. *Morris,* 14 Cal. 76, 73 Am. Dec. 615; *Wand* v. *Wand,* 14 Cal. 512. The acts of adultery charged were condoned by the defendant and are therefore not available in recrimination. 2 Bish M., D. & Sep. § 405; *Jones* v. *Jones,* 3 C. E. Greene, 30, 90 Am. Dec. 607. After intercourse and cohabitation condonation is presumed and implied. 1 Bish. M., D. & Sep. 273 and note; *Doe* v. *Doe,* 52 Hun. 405; § 2748, Rev. Codes. If defendant desired to avail herself of the de-fense of recrimination, she should have plead it. *Smith* v. *Smith,* 4 Paige 432; 27 Am. Dec. 75; *Pastoret* v. *Pastoret,* 6 Mass. 276, 30 Am. Dec. 607. The conduct of appellant was calculated to excite such mental suffering as to render respondent's condition in-tolerable and furnished cause for divorce. *Rice* v. *Rice,* 6 Ind. 100; *Goodrich* v. *Goodrich,* 44 Ala. 670; *Farnham* v. *Farnham,* 73 Ill. 467; *Gibbs* v. *Gibbs,* 18 Kan. 419; *Briggs* v. *Briggs,* 20 Mich. 34; *Freeman* v. *Freeman,* 30 Wis. 235.

WALLIN, J. The plaintiff by this action is seeking a total divorce from the bonds of matrimony. The trial court found in favor of the plaintiff, and entered judgment divorcing the parties, and decreeing the custody of their only child, a daughter, to the de-fendant. The grounds of the action, as stated in the complaint, are extreme cruelty and desertion, but there is no claim that such ex-treme cruelty consisted of any bodily violence either done or threat-

ened by the defendant, nor that the desertion charged against the defendant consisted of an actual quitting of plaintiff's place of abode by the defendant. The only desertion claimed (and this claim is abandoned in this court) is that the plaintiff, to secure immunity from quarrels alleged to have been fomented by the fault of the defendant, was obliged to leave his home, and that he did leave under such circumstances as would make the defendant guilty of constructive desertion under the provisions of subdivision 3, § 2740, Rev. Codes 1895. Defendant appeals from the judgment, and demands a trial anew in this court of the entire case.

The parties were married at St. Paul, Minn., in the month .of June, 1889, and lived together in that city until their separation. Plaintiff charges that the defendant deserted him, in the manner above stated, on the 12th day of November, 1896, but it appears by the undisputed testimony, and it is a conceded fact, that the parties cohabited together in the month of August and in November in said City of St. Paul, in the year 1897. The particular acts of cruelty, as charged in the complaint, consists of frequent and violent quarrels and petty annoyances caused by the defendant, and extending over a period of at least six years. It is charged that such annoyances and quarrels were chiefly caused by a groundless dislike and bitter prejudice cherished on defendant's part against the mother and sister of the plaintiff. Another charge in the complaint is that the defendant unreasonably and without sufficient cause often refused plaintiff marital rights, and further that defendant falsely accused the plaintiff of conjugal infidelity, and falsely and maliciously preferred a charge of adultery against the plaintiff, and thereby maliciously and cruelly caused his arrest. To these charges the defendant answered, denying them broadly and in detail. The defendant also alleges that on the 14th, 15th, and 16th days of August, and on the 16th day of November, 1897, she cohabited and had matrimonial intercouse with the plaintiff. This intercourse is conceded by the plaintiff, and is now relied upon on both sides as constituting condonation of any and all matrimonial offenses as charged respectively in the complaint and answer and occurring prior to November 16, 1897. Defendant, by her answer, as a further defense to the cause of action alleged in the complaint and by way of recrimination charges the plaintiff with acts of marital infidelity committed with three other women, viz: with one C. W., a woman of ill fame, in the month of October, 1893, and in this connection the defendant charges that plaintiff contracted gonorrhea as a result of said intercourse, and subsequently communicated said disease to the defendant, and that the defendant experienced great suffering as a consequence of contracting said disease from her husband, and that as a result.of such disease the defendant was obliged to undergo a painful surgical operation. Defendant further charges that plaintiff had sexual intercourse with a housemaid in defendant's employ in the.month of May, 1896. By way of further recrimination defendant expressly charges that the

plaintiff formed a criminal intimacy with one Miss C. R. in the month of March, 1895, and that such intimacy has continued ever since; that plaintiff had sexual intercouse with said C. R. in March, 1895, at said City of St. Paul, and that said unlawful intercourse was continued, and was had in 1895 and 1896, in said city, and at certain places, as stated in the answer. The answer further charges. that said adulterous intercourse between plaintiff and C. R. occurred at Great Falls, Mont., and at the Helena Hotel, in the City of Helena, Mont., in the fall of 1896, and that said illicit intercourse continued and took place on or about the 7th of December, 1896, at the St. James Hotel, in Minneapolis, Minn., and that plaintiff and Miss R. were registered at that hotel as man and wife, and occupied a room there as man and wife; that later, and at St. Paul, Minn., said adulterous relation continued in the summer and autumn of 1897, and as late as the 21st day of November, 1897. Turning now to the testimony bearing upon the plaintiff's alleged cause of action, extreme cruelty, we are constrained to say that after repeated perusals of the testimony, and upon mature deliberation thereon, we are unable to agree with the learned trial court in its finding that the defendant had been guilty of that degree of cruelty which, under the statute, would entitle the plaintiff to a divorce from the bonds of matrimony. The evidence of the parties touching the alleged extreme cruelty embraces about all the testimony given by witnesses who are in a position to speak definitely as to facts within their own personal knowledge and observation, and the evidence of the respective parties is in direct conflict. We nevertheless think that we are warranted in saying upon the record that the plaintiff, in his testimony, has very much colored and exaggerated many of the quarrels and matrimonial troubles about which he has testified, and upon which he relies, and that the troubles and dissensions which no doubt at times arose between these parties were by no means as frequent or as aggravated in character as they would appear to be in the light of the plaintiff's testimony when considered apart from the testimony of the defendant. But, inasmuch as we have concluded to place our decision of the case chiefly upon another and wholly independent ground, we shall dismiss this feature of the case with the single observation that, in our judgment, the plaintiff has failed to sustain his charge of extreme cruelty by any preponderance of evidence.

Turning to the defendant's case, we will first notice the fact, as has been seen, that the defendant, by way of recrimination, and as against the plaintiff's cause of action, has alleged in her answer that the plaintiff has since said marriage been guilty of repeated acts of marital infidelity, and expressly charges that such acts were committed with three different women, who are named in the answer, and committed at times and places as set out in the answer. We shall find it necessary to refer to but two of these charges, both of which, in our opinion, are sustained. Defendant alleges "that in the month of October, 1893, plaintiff cohabited with one Cara Weise,

a woman of ill fame, and thereby contracted gonorrhea, and communicated the same to the defendant." The plaintiff, in his testimony, denies this charge; but upon the record we shall hold that the same was sustained by a preponderance of proof. Defendant has testified that she contracted gonorrhea by having intercourse with her husband, and no charge or insinuation is made against defendant's reputation for chastity. In support of her testimony the defendant called a reputable physician, whose professional standing is conceded, and his testimony is explicit to the point that the defendant was afflicted with gonorrhea, and that he treated defendant for some time for that disorder. To this is added the testimony of the defendant to the effect that the plaintiff confessed to defendant and admitted sexual intercourse with said woman of ill fame. In our judgment, this convincing evidence has not been overcome by the plaintiff's denial. As already shown, the answer accuses plaintiff by way of recrimination with acts of illicit intercourse with one R., and charges that this illicit intercourse and relation was kept up from its inception in March, 1895, and during the years 1896 and 1897. In our judgment, the testimony in this record, despite the repeated but bald denials of the plaintiff as made in his testimony, is replete with proofs of the truth of the charge last above mentioned. The evidence sustaining this accusation does not rest alone upon the testimony of the defendant, nor upon plaintiff's confessions by word of mouth to defendant, which the defendant swears the plaintiff made with many tears, and with much outward evidence of penitence and mental distress on plaintiff's part. To such evidence, which we think is true, there must be added corroborating testimony, both direct and circumstantial, and which is both oral and written. To our minds this evidence, in its cumulative weight, leaves no room for doubt that the charge under consideration is true in substance and in fact. Without detailing this evidence, we will say that this charge of plaintiff's infidelity to marriage vows is sustained, first, by the testimony of the defendant, who states that this matter was often talked over between husband and wife, and that in such talks the plaintiff freely confessed his illicit relations with R., and that plaintiff's first admission of the fact occurred as early as September, 1896, and that very soon after said date the plaintiff attempted suicide by shooting himself with a pistol, or at least that he so stated to his wife in explanation of the fact of having a flesh wound in his side. It is further true, however, that plaintiff had previously said that the wound was occasioned accidentally in removing plaintiff's revoler from his pocket. Defendant also testified that plaintiff told her in October, 1896, that R. was about to go to Montana. Defendant further swears that after learning of plaintiff's said liaison the defendant had an interview with said R., and the matter of her relations with plaintiff was talked over between defendant and R., and that at such interview R. turned over to defendant a diamond ring, and that the defendant kept the ring until her husband asked for it, and she then, to avoid a quarrel, gave the ring to him. De-

fendant testifies that when the plaintiff made said confessions to her that he was not angry nor unkind, but seemed to feel badly or sorry over the matter. The following letters, written by the plaintiff to his wife, were put in evidence by defendant in support of her charges against her husband now under consideration:

"Louie: I am going to take a car for Minneapolis now, and shall stay over there until next week some time. It is no use Louie. I cannot try any longer. I am a hypocrite every minute I am home, and I can't do it, and shall not try. If we can't fix it between us here all right, after a few weeks I shall go West. Am so sorry to cause you pain and sorrow, but I just can't help it. John."

"Wednesday, Nov. 11, '96. Louie: I drink too much, stay out nights too much, and feel too bad, and I can't do it any longer. Have written to her to come back. If she don't I shall go out West to her next week. I must have her one way or the other, or I could not stick it out a week longer. Brace up, and get well, and try and be contented and happy. The Lord knows I wish it, but I can't stay and try to help you at the expense of my own life; and I don't believe I can be of any help to you the way I am. If I go West next week, will stay until it is fixed between us, and I feel sure you will arrange it when you feel better, and think it all over. In the meantime you will be provided for and made comfortable, and you always will be. As things stand, I can't stay home until I decide about going West. I cannot see you, or talk to you. I feel sorry for you, for her, and for myself, and between the conflicting emotions I can't stand it. It surely would be too much for me very soon, and would result disastrously, I fear. I feel much better alone, and then know I am at least true to one. I cannot be to two. It is she or something much worse for us all, and you surely cannot wish that. Brace up, Louie, and bear it. Either you or I must conclude to suffer for the sake of the other, and I have tried and failed. Now you must try, and see if you cannot let me go, for my sake. You surely do not wish to punish me, and you can do much for me by releasing me. Otherwise I must go, and everything will be wrong for all of us. But I must do it, if there is no other way, in protection to myself. Do not send for me. I cannot bear to see you feel bad, and will not come back again. I cannot do it, so do not ask. It is better for me to stay away now than to wait until she comes, or until I go, for we both would be perfectly miserable the next week. Send my things down this afternoon, so I won't have to buy new ones. Good-bye. John."

"Helena, Montana, Nov. 17, 1896. Louie: Got your telegram, and waited at Great Falls for your letter, as did 'Cis' for one for her. We had our plans all arranged, and the letters did not change them. I came to Helena last night, and leave for the coast tonight. Don't know where I will stop next, or how long I will stay, so don't write again, as a letter would not catch me. Am having a nice trip and a good time. You were entirely wrong in your surmise as to Celia. She is all right, and always was. I don't like

at all the way you wrote her. You said many things you should not, and it don't do any good. Neither did it do any good to write me about her. I told you in the last letter I wrote how I wanted it, and how it must be, and so it must be. I may come home after a time, but if I do I don't want to be molested in any way, or should immediately jump out again, and then I would stay away. You wrong Celia greatly for blaming her for anything I do. She is not to blame in the least for anything I have done. It is entirely my own doings, and I alone am to blame for it. Can't you see that by your interference you are only making matters worse? You will not be satisfied until you drive me out of the country entirely. When you do that, am sure you will find yourself far from satisfied, and we all will get the worst of it. I am not only willing, but anxious, to get back to my business, and help John; but when I go back to stay I want 'Cis' with me, or I could not stay, as I told you before. I need my business to get along with, and have a great deal involved there, but not so much as to allow it to stand in the way of my future. I can do well and get on finely anywhere out here. You say a good deal lately about the poorhouse, not only to me but to others. You know that you will always be cared for."

"St. Paul, Minn., Nov. 25, 1896. Louie: I got back this morning all right. Left her on the coast in Washington. Don't know just where she will stop, as she was going the last I saw of her; but I will hear soon. Don't bother me, as I can't come back, and don't want to be interfered with if I am going to stay here. Was going to send you some money today, but John said he sent you $50, and I guess you have some yet. If you run short during the week, let me know. John."

The following letter was received by the defendant the first week in December, 1896: "Friday, p. m. Louie: Got home this afternoon, but can't come up to-night. There is no earthly use in my trying to do it, and I have made other arrangements definitely. My peace of mind, rest, sleep, and ability to attend to work compel me. We worry each other, and both will be better off alone, if you would only look at it reasonably. Please don't write me letters, or to mother either. They only worry us, and will do no good, as I shall not try again. Please send all my things to me,—shaving set, violin, and clothes. Will send up for them Saturday or Monday, if you will have them ready. Will send you money in day or two, and will keep you supplied regularly. Think you had better go East when you get better, as I very much hope you will soon. John."

One other letter was put in evidence. It reads as follows: "Minneapolis, Minn., Feb. 8, 1897. Louie: Was over yesterday for supper, and intended going to see you, but it was after 8 before I got started, and it was then too late. Have opened a small office here, and will see what turns up this spring. I took the old hand type and material, so the office did not cost anything. I send you check for $10. I have sent you over $15 for 2 months, and paid the

rent and many bills besides. Why will you tell around town that I am not caring for you or paying the rent. I am getting about tired of your making trouble for me. You will have to stop it, or you will be sorry. What did you go to Celia's folks for with a lot of truck, and make me trouble? I will not stand it, and shall take steps to stop it immediately if I hear any more of it. It don't do you any good at all, and will do you a great deal of harm if you don't quit it. I intend to see you soon, and come to some sort of an agreement with you, although I think you might either save me the trouble of doing it, or at least let me alone. You made me considerable trouble last week, and it must be stopped if you want me to stay here, and take care of you. John."

It appears by the testimony offered by the defendant that said C. R. left Minnesota in the fall of 1896, and that plaintiff, soon after her departure, went West also, and visited, among other places, Great Falls and Helena, Mont. He was seen and recognized at Helena on the 17th day of November, 1896, and the register of the Helena Hotel on that day contained the following entry in plaintiff's handwriting, "J. A. Gardner and wife." It is further shown that later in the fall of 1896 both the plaintiff and C. R. had returned to Minnesota, and that the register of the St. James Hotel, Minneapolis, Minn., on "Sunday, December 6, 1896," contained the following entry, "Albert Gardner and wife, Mpls," which entry was also in plaintiff's hand writing. It further appears that plaintiff's wife, this defendant, was not with plaintiff on the dates stated, and did not stop at either of said hotels with plaintiff. The plaintiff had an opportunity to combat this evidence while on the stand as a witness in his own behalf in rebuttal. He did not do so, despite the fact that he was in a position to deny his said registration at said hotels at the times mentioned, if the same could truthfully have been denied. To our minds, a very strong presumption arises from the plaintiff's silence that the testimony on this feature of the case is true. That it is, in connection with the other evidence, very damaging, is evident without further comment. In lieu of any such denial, the plaintiff is content to testify in general terms that he was never criminally intimate with C. R. at said hotels or elsewhere. There is other evidence in the record, to which we have not alluded, pointing strongly to the fact that the plaintiff in 1896 and 1897 was sustaining illicit relations with said C. R., and that for a part of this time the plaintiff absented himself from his wife and home in order to keep up this liaison without let or hindrance on account of his domestic ties. To our mind, the fact of this criminal intercourse with C. R. is conclusively established from various and independent sources of evidence, and we are at a loss to understand on what theory the learned trial court could have reached an opposite conclusion. There is, in our opinion, abundant testimony to sustain the charge under consideration aside from the explicit and positive evidence of the plaintiff's own oft-repeated confessions, as testified to by the defendant. Just here

we deem it proper to observe that, in our judgmnet, the record will compel this court to give the greater weight to the testimony of the defendant wherever the same is found to be in conflict with plaintiff's testimony. We think the evidence in this record fully impeaches and destroys the testimony of the plaintiff upon every feature of the case wherein plaintiff's own testimony is uncorroborated.

But, as we have seen, the parties to this action voluntarily cohabited with each other as man and wife in August, 1897, and likewise as late as on November 16, 1897. Defendant's counsel contend that such cohabitation operates in law as a condonation by the plaintiff of all causes of action on account of extreme cruelty existing prior to such voluntary cohabitation; but under the evidence, when considered with reference to the statute governing the subject of condonation, this point is not clearly with defendant, and we will therefore pass it over, as the same is unnecessary, in our judgment, to a proper decision of the case. But, on the other hand, it is strenuously contended by counsel for the plaintiff that the causes of action against the plaintiff pleaded by defendant in recrimination were fully condoned by defendant and wiped out as causes of action by said voluntary cohabitation between the parties, and consequently that such causes of action are not a bar to plaintiff's alleged cause of action. As has been shown, this point, however ruled, would not prevent a reversal in this case upon the ground that plaintiff has failed to sustain the charge of extreme cruelty by a preponderance of testimony. But we are decidedly of the opinion that the plaintiff is not in a position to avail himself of the alleged condonation of the causes of action against the plaintiff which are set out in the answer by way of recrimination, and which, in our opinion, have been amply sustained by the evidence in the case. Under the statute (section 2749, Rev. Codes 1895, which voices the judicial decisions on the point) there is annexed to every condonation a vital condition subsequent. The statute declares that "condonation implies a condition subsequent that the forgiving party must be treated with conjugal kindness." The evidence in this record irresistibly leads this court to the conclusion that since the date of the said condonation in August, 1897, and on November 16, 1897, the forgiving party, the deeply injured and betrayed wife, has not been treated with conjugal kindness by her husband, the guilty party. The record compels an opposite conclusion, viz: that since the date of such condonation the defendant has been subjected to the greatest possible conjugal unkindness.

This brings us to the evidence bearing upon the matter of the arrest of the plaintiff and said C. R., which took place after midnight, at St. Paul, on the 22d day of November, 1897, and under which the parties were taken by the police to the police station, and there kept over Sunday, and until the next day, when the two were bailed out. The case against the parties arrested after several continuances was dismissed, and never came to a trial on its merits.

This arrest is claimed by the plaintiff's counsel to be a new and independent ground of action, which alone entitles plaintiff to a divorce on the ground of extreme cruelty. This position rests upon two assumptions of fact: First, that the defendant did cause the arrest; and, second, that in doing so the defendant made a false charge against the plaintiff, or at least that the charge was made without reasonable cause. As to whether defendant caused the arrest indirectly by her information, or whether the police acted upon their own responsibility after getting such information, there is some conflict in the testimony; but the evidence was undisputed that the defendant did not at any time swear to or sign any complaint or accusation against the parties in the matter. The parties were arrested without warrant, which arrest was, of course, entirely legal and proper, if, as a matter of fact, the two parties arrested were, when arrested, in the commission of a criminal offense. It is conceded that at the time the police entered the room occupied by C. R. she was undressed, and in bed, and that the door of her room was opened on demand of the police by the plaintiff, who was then and there undressed, and in his night robe. This arrest was made at a boarding house where plaintiff and C. R. had adjoining rooms, and plaintiff himself testified that he had acted for C. R. in securing for her accommodations in that house. The testimony of both officers who participated in the arrest establish the facts connected with such arrest to our satisfaction, and their evidence shows that the parties, when arrested, were in *flagrante delicto*. It further appears by defendant's testimony that she saw the parties who were arrested in one of the two adjoining rooms on two different occasions when she was passing the house upon the street on which the boarding house fronted. Defendant admits and testified that she gave information to the police as to the whereabouts of the parties arrested, but denies that she made any complaint, or otherwise caused the arrest. At the time of the arrest it appears that the defendant and plaintiff's mother, who had long been estranged on account of family differences, were then living together upon amicable terms, and both mother and wife were then zealously co-operating in their efforts to reclaim the plaintiff from his evil courses, and to recall him to his home and duty. The information furnished the police was one measure taken in pursuance of this meritorious endeavor. Concerning this arrest, defendant testified: "My object in notifying the police was to have the police identify the intimacy, and recall my husband, if possible." She was greatly importuned by the authorities, as appears, to prosecute the case against the plaintiff and his paramour, but was firm in her refusal to do so; and without her co-operation the case was necessarily dropped for technical reasons. Had she been revengeful in her feelings towards plaintiff, she certainly would have not neglected so good an opportunity to gratify such revengeful feeling. But the entire evidence shows that the defendant has manifested a forgiving spirit. She wants no divorce, and asks for none. Her very last words upon the stand are

these: "I entertained a spirit of foregiveness towards Mr. Gardner, and I do yet." "I would live with him now." The condonation in question is, in our judgment, unavailing to the plaintiff. It has not been followed by conjugal kindness on the part of the guilty party, the plaintiff. After the marital intercourse between the parties to the action now relied upon as condonation had occurred, we find the plaintiff committing the gravest of offenses against his wife, and thereby fully justifying a withdrawal of such condonation.

We should have stated, in another connection, that the plaintiff admitted on the stand that he wrote the letters to his wife which are set out in this opinion, and attempts to do away with their effect as confessions of gross infidelity to his wife by saying, in effect, that they were written only to induce his wife to apply for a divorce, which he was anxious to have his wife obtain, and had never been able to induce her to apply for. We will only say that this court cannot accept this version of these letters as their only explanation. The letters, in their statements of fact, tally with all the rest of the testimony bearing upon the liaison between the plaintiff and C. R., and, while they might furnish evidence upon which defendant could procure a divorce, had she seen fit to seek divorcement, they also tell of guilt in fact, and their statements appear to us to be mainly true in their substantial features and in their essential details of fact. In concluding this branch of the case we wish to remark that, while this record discloses a most deplorable state of marital infelicity and infidelity, yet this court cannot for a moment entertain the suggestion of counsel that such reasons should influence a court in favor of granting a divorce. We cannot place a premium upon marital offenses. It may be that in a given case the real interests of the parties or the welfare of society would be subserved were the parties legally separated. But courts rest under the most solemn obligation to apply the law as it exists to the facts of each case. A divorce may be granted only upon statutory grounds, and where such grounds exist a divorce may not be denied. A court must not be influenced by any general views concerning the welfare or interests of the parties or of society.

One further matter remains for brief consideration. In this court a motion was made in behalf of the respondent to strike the statement of the case, which was allowed and settled by the District Court, from the record and files in this court. The motion is based upon the ground that such statement was not settled in the court below within the period allowed by statute for that purpose; that the time for such settlement had not been extended by the trial court, and that appellant had never excused her default in the matter of time in obtaining a settlement of the statement in this action. We have considered the affidavits and counter affidavits filed here and submitted to the trial court upon the matter of extending time and settling the statement of the case, and our conclusion is that time was extended and the statement settled upon substantial grounds and upon due cause shown therefor. In pro-

ceedings looking to a new trial or an appeal to this court the matter of extending time after the statutory periods have run is, by the terms of the statute, expressly committed, where cause is attempted to be shown, to the sound judicial discretion of the trial court. Section 5477, Rev. Codes. This statute is remedial, and as such should be liberally construed in favor of the discretion vested in the trial court. *Johnson* v. *Railroad Co.,* 1 N. D. 354, 48 N. W. Rep. 227. It is further true that where an issue upon the question is made in the court below, and it appears that no cause is in fact shown, and that time is extended against objection, the discretion of the court will be reviewed, and set aside in this court. To extend time in such cases against objection, and in the absence of cause shown, is an abuse of discretion. See *McGillycuddy* v. *Morris* (S. D.) 65 N. W. Rep. 15, citing *Moe* v. *Railroad Co.,* 2 N. D. 282, 50 N. W. Rep. 715. The motion to strike out the statement is therefore denied. Our conclusion is that the judgment entered in the trial court must be reversed, and that court is directed to reverse such judgment, and enter a judgment dismissing the action, with costs of both courts in favor of the defendant. All the judges concurring.