## JULIANE THOMPSON v. LOUIS THOMPSON.

(156 N. W. 492.)

Divorce — evidence — uncorroborated statement, admission or testimony of parties — collusive divorces — object of statute — strength of corroboration.

1. Section 4400, Compiled Laws 1913, which provides that "no divorce can be granted . . . upon the uncorroborated statement, admission, or testimony of the parties," was intended to guard against collusive divorces, and in any action, where the record and evidence considered as a whole precludes any reasonable probability of collusion, the corroboration need not be very strong, or extend to every feature of the cause alleged.

Physical violence — extreme cruelty — what constitutes — conduct — mental feelings — impairment of health — ends of matrimony.

. 2. Physical violence is not necessary to constitute extreme cruelty within the meaning of §§ 4380, 4382, Compiled Laws 1913 (relating to divorce), but any unjustifiable conduct on the part of either husband or wife which so grievously wounds the mental feelings of the other as to seriously impair bodily health, or utterly destroy the legitimate ends and objects of matrimony, constitutes extreme cruelty within the meaning of the statute, although no physical or personal violence may be inflicted.

Opinion filed January 10, 1916.

From a judgment of the District Court of Divide County, *Leighton,* J., defendant appeals.

Affirmed.

*E. R. Sinkler,* for appellant.

---

Note.—For various illustrations of the doctrine that cruelty which will justify a divorce does not necessarily involve violence, but may consist of any unjustifiable conduct which destroys the legitimate ends and objects of matrimony, see Miller v. Miller, 89 Neb. 239, 34 L.R.A.(N.S.) 360, 131 N. W. 203; Hooe v. Hooe, 122 Ky. 590, 5 L.R.A.(N.S.) 729, 92 S. W. 317, 13 Ann. Cas. 214; McClintock v. McClintock, 147 Ky. 409, 39 L.R.A.(N.S.) 1127, 144 S. W. 68; Bechtel v. Bechtel, 101 Minn. 511, 12 L.R.A.(N.S.) 1100, 112 N. W. 883; Robinson v. Robinson, 66 N. H. 600, 15 L.R.A. 121, 49 Am. St. Rep. 632, 23 Atl. 362; Barnes v. Barnes, 95 Cal. 171, 16 L.R.A. 660, 30 Pac. 298.

And for discussion of the general question of cruelty as ground for divorce, see notes in 29 Am. Dec. 674; 73 Am. Dec. 619; 40 Am. Rep. 463; 51 Am. Rep. 736; and 65 Am. St. Rep. 69.

There is no corroboration of the plaintiff, and her charge of cruel and inhuman treatment is unsupported and is based only on her own testimony. Rev. Codes, § 4069; Reid v. Reid, 112 Cal. 274, 44 Pac. 564.

Further, in such cases, where the testimony of the parties is in conflict, that of the defendant is entitled to the greater weight. Rie v. Rie, 34 Ark. 37; Ortman v. Ortman, 92 Mich. 172, 52 N. W. 619; Sowers v. Sowers, 33 Phila. Leg. Int. 220; Jenkins v. Jenkins, 86 Ill. 340; Paden v. Paden, 28 Neb. 275, 44 N. W. 228; Hagle v. Hagle, 74 Cal. 608, 16 Pac. 518; Potter v. Potter, 75 Iowa, 211, 39 N. W. 270.

C. E. Brace, for respondent.

The object of the statute which provides that no divorce shall be granted upon the uncorroborated statement, admission, or testimony of the parties is to prevent collusion. That there was no collusion in this case is clearly shown by the record—the attitude of the parties, and in consequence, very slight corroboration is necessary. Tuttle v. Tuttle, 21 N. D. 503, 131 N. W. 460, Ann. Cas. 1913B, 1; Clopton v. Clopton, 11 N. D. 212, 91 N. W. 46.

CHRISTIANSON, J. Plaintiff brought an action for divorce on the statutory ground of extreme cruelty. The trial court found in favor of plaintiff, and entered judgment of absolute divorce, and awarded her the custody of the only child, a daughter about two and a half years old; and also permanent alimony in the sum of $1,100, $100 attorney's fees, and $150 for expenses and suit moneys. Defendant appeals from the judgment, and demands a trial de novo in this court.

Appellant asserts that the judgment appealed from must be reversed for two reasons: (1) That plaintiff's testimony is uncorroborated; (2) that such testimony, even though sufficiently corroborated, is insufficient to establish the charge of extreme cruelty. The undisputed evidence shows that the parties to this action were married in Norway, on July 10, 1910. A few days after the marriage, they returned to defendant's home, near Crosby in this state, where they have lived since that time. On July 20, 1912, a daughter was born. The plaintiff became afflicted with tuberculosis, and during the winter of 1912–1913, was confined to her bed a great deal of the time. Defendant did not obtain any medical assistance for her, and he gave her only $15 in all

to enable her to go to the local doctor, and to one Dr. Vig, at Kenemare, for medical treatment. Defendant does not claim to have sought or furnished any medical aid for his wife; and plaintiff testifies that he told her "there was nothing to do for it, no use to go to a doctor." Plaintiff also testifies that defendant refused to obtain milk necessary for the nourishment of herself and child.

We quote from her testimony:

Q. When the baby was small, did Thompson ever refuse to have milk in the house for the baby and you?

A. I stayed a long time and was without milk in the house.

Q. Why didn't you have milk?

A. Because he wouldn't get any milk. I asked him if he would not get a milk cow, and it was just as impossible for me to be without milk as it was to be without food.

Q. Did he have any milk cow at that time?

A. Yes.

Q. But he just quit milking her, did he?

A. She milked some, but he quit milking her.

Q. What did you do for milk?

A. I stood it as long as I could, and then I took the baby on my arm and walked after milk to a neighbor a couple of miles off.

Q. And did you get milk from the neighbors when you went after it yourself?

A. Yes, when I had been one month without milk, four weeks.

Q. Did you have consumption when you came to America, Mrs. Thompson?

A. No. I wasn't sick or anything. I didn't know I was sick until I was without milk so long.

Q. That was when your baby was small that you were without milk?

A. Yes.

Q. From your experience with Mr. Thompson both before and after the first suit, are you sure that you cannot live with him any longer?

A. Yes, when I cannot get the necessary nourishment I need, and he didn't go after a doctor for me until a long time after I had asked for a doctor, I lay there all winter long and was so sick I could hardly raise up in bed, and it appeared to me that he didn't care whether I was sick or not.

The testimony also shows that while sick, plaintiff was frequently required to carry water for the house for quite a long distance,—about 20 rods; that the defendant frequently failed to carry either water or coal, and became angry with plaintiff when she requested him to do so, and that at times he scolded her for being sick.

She also testified:—

Q. Did you at any time walk to Crosby to see the doctor?

A. Yes.

Q. Why did you walk?

A. Sometimes when I would get the horse to go, he wouldn't like it, then I thought it would be best to walk.

Q. Then you walked to save trouble with Mr. Thompson?

A. I walked because I did not like to see him get mad, on account of the horses. And then I thought I could remain a longer time so I could find the doctor if I walked."

In the fall of 1913, plaintiff brought an action for divorce against her husband, but a reconciliation was effected, and she went back and lived with him. About this time defendant gave the plaintiff $100. Some time afterwards he demanded that she return him part of the money. The plaintiff refused to return it, and they had some trouble about it.

The following is the version of the trouble as related by Selmar Simonson, a neighbor boy, who was present at the time:—

(Direct examination.)

Q. You know Mr. and Mrs. Thompson?

A. Yes.

Q. Were you out there at their place this winter when Mr. Thompson was trying to make Mrs. Thompson give him some money?

A. Yes.

Q. Tell us what you saw and heard?

A. Well I saw him go out and get a hatchet and broke open the trunk and wanted the money, and he threw out the bedclothes off the bed. That is all I saw.

Q. Did you see him hurt her at all?

A. Yes, he sat her down on a chair.

Q. Was he talking to her in an angry manner?

A. Yes.

Q. Tell us what you heard him say to her, if you remember?

A. I couldn't understand but he was swearing some.

(Cross-examination.)

Q. You say Mr. Thompson was looking for some money?

A. Yes.

Q. How do you know he was looking for some money?

A. He said he was.

Q. He went and took a hatchet and pried under the lid of the trunk and opened it up?

A. Yes.

Q. That is the way you mean he broke open the trunk?

A. It was locked before.

. . . . . . . . . . . . . . . . .

Q. He took the bedclothes back from the bed and looked?

A. He threw them off on the floor, yes.

. . . . . . . . .

Q. Did she say she was going away because he was looking for that money?

A. Yes, she was scared of him.

Q. Did she say so?

A. No, she didn't say so.

Q. How do you know she was scared of him then?

A. Because I saw she was scared.

. . . . . . . . . . . . . . . .

Q. He sat her down on the chair and said: "You go and find the money."

A. Yes.

Q. And she sat down and didn't look for the money?

A. No, she went upstairs then.

Q. And she stay upstairs?

A. No, she came down, and he met her and he got the money.

This incident is admitted by defendant, although he denies that he broke the trunk, or used any unusual amount of force in seating plain-

tiff on the chair. The testimony, also, shows that defendant at times would get drunk.

1. It is true as asserted by appellant's counsel that under the laws of this state "no divorce can be granted . . . upon the uncorroborated statement, admission, or testimony of the parties." Comp. Laws, 1913, § 4400. The meaning and object of this statutory provision was fully considered by this court in Clopton v. Clopton, 11 N. D. 212, 91 N. W. 46, and it was there held that the purpose of the statute is to guard against the evil of granting collusive divorces, and that where the case considered as a whole precludes any possibility of collusion the corroboration need be very slight. The rule laid down in Clopton v. Clopton was again followed by this court in Tuttle v. Tuttle, 21 N. D. 503, 131 N. W. 460, Ann. Cas. 1913B, 1.

The record in this case shows that defendant has twice been adjudged guilty of contempt for refusing to comply with the court's orders requiring him to pay temporary alimony. There is not the slightest reasonable probability of collusion between the parties to this action, and we believe that (within the rule announced by this court in Clopton v. Clopton, supra) there is sufficient corroboration of plaintiff's testimony to justify the judgment rendered by the trial court. See also Tuttle v. Tuttle, supra, and extensive note thereto in Ann. Cas. 1913B, 1; 14 Cyc. 689.

2. We also believe that the evidence, considered as a whole, is sufficient to establish the charge of cruel and inhuman treatment. It is true (with exception of the incident related by the witness, Selmar Simonson), there is no evidence of physical violence. But it does appear from the evidence that defendant failed to procure proper medical attendance for his wife. He neglected her, even while she was confined to her bed with illness. He failed to do anything to alleviate her suffering, and by his neglect aggravated both her physical and mental suffering. He exhibited a total want of affection or consideration for his wife, and even failed to manifest that degree of care and sympathy which might be expected from a man toward any sick woman, even though she were a total stranger. It is not alone physical violence which constitutes cruel and inhuman treatment. Other acts may occasion far greater pain than any inflicted by physical violence. Mental suffering may be much greater than physical suffering. In this case there is

evidence of both. "It was formerly though that to constitute extreme cruelty, such as would authorize the granting of a divorce, physical violence is necessary; but the modern and better considered cases have repudiated this doctrine as taking too low and sensual a view of the marriage relation; and it is now very generally held that any unjustifiable conduct on the part of either the husband or wife, which so grievously wounds the feelings of the other, or so utterly destroys the peace of mind of the other, as to seriously impair the health . . . or such as utterly destroys the legitimate ends and objects of matrimony, constitutes extreme cruelty under the statutes." Carpenter v. Carpenter, 30 Kan. 712, 46 Am. Rep. 108, 2 Pac. 144. See also 14 Cyc. 609 (B); McDonald v. McDonald, 155 Cal. 665, 25 L.R.A.(N.S.) 45, 102 Pac. 927; Doolittle v. Doolittle, 78 Iowa, 691, 6 L.R.A. 187, 43 N. W. 616; Mercer v. Mercer, 114 Ind. 558, 17 N. E. 182; Mosher v. Mosher, 16 N. D. 269, 12 L.R.A.(N.S.) 820, 125 Am. St. Rep. 654, 113 N. W. 99; Tuttle v. Tuttle, 21 N. D. 503, 131 N. W. 460, Ann. Cas. 1913B, 1; Briggs v. Briggs, 56 Wash. 580, 106 Pac. 126; Benfield v. Benfield, 44 Or. 94, 74 Pac. 495.

The conclusion reached by the learned trial court was correct, and the judgment appealed from is affirmed.