## HILDA JOHNSON, Appellant, v. CARL F. JOHNSON, Respondent.

(197 N. W. 773.)

**Divorce — evidence held sufficient to justify judgment of dismissal.**

In an action for divorce upon the ground of extreme cruelty, where upon appeal plaintiff has demanded, in a trial de novo, a review of the evidence, it is *held*, for reasons stated in the opinion, that the findings and conclusions of the trial court are fully sustained by the evidence.

Opinion filed March 11, 1924.

Divorce, 19 C. J. § 367 p. 142 n. 52.

In District Court, Wells County, *Coffey,* J.
Action for divorce.
Plaintiff has appealed from the judgment of dismissal.
Affirmed.

**Note.**—What constitutes cruelty as grounds for divorce, see notes in 18 L.R.A. (N.S.) 303; 34 L.R.A.(N.S.) 360; 9 R. C. L. 335; 2 R. C. L. Supp. 782; 5 R. C. L. Supp. 509.

*H. A. Olsberg,* for appellant.
*Adam Zuber,* for respondent.

BRONSON, Ch. J. This is an action for divorce upon the ground of extreme cruelty. The trial court found that defendant had not been guilty of extreme cruelty as alleged and dismissed the action. Plaintiff has appealed from the judgment and, in this court, now demands a trial de novo.

The facts, generally stated, are: The parties, after their marriage in December, 1911, resided upon a farm in Barnes county, near Heimdahl, where they resided together until June, 1922, when plaintiff left her husband, went to her mother's house in Valley City, and later, in June, 1922, brought this action. They have four children ranging in ages from five to ten years. Plaintiff testifies, concerning the circumstances of their married life, to the general effect that her husband was ill-tempered, scolded and upbraided her, and upon occasion, slapped her in the face; that once he kicked her out of bed; that he accused her of infidelity, frightened her by having guns in the house and carrying them about or asking her to shoot him, objected to her visiting her parents and ordered her to stay away, if she did visit her parents. Some six years after their marriage, plaintiff went to her mother's home. Defendant went there to see her. An altercation took place between him and plaintiff's brother. Plaintiff remained there some eight months. Then defendant came and begged forgiveness. Plaintiff determined to try him again, but his conduct did not change. In June, 1922, plaintiff wanted to visit her parents; defendant objected. She, nevertheless, went taking with her the two youngest children. Then she did not intend to leave him but intended to return; but defendant did not write asking her to return, nor did he advise her, after she had written to the boys stating the date of her return, that he would meet her. So this divorce action was instituted the day after the day she intended to return.

Otherwise, plaintiff testified that her husband was active, never idle, and a good provider; that they had a nice home.

Plaintiff's mother, a brother, and a sister testified to circumstances of scolding, upbraiding and ill temper by defendant. Likewise, to some

extent, a school teacher who roomed for a time at their home, and a hired man.

Defendant testified to the general effect that his wife had entirely over-emphasized his conduct towards her; that in general they were very happy until plaintiff's relations started to intermeddle with their family affairs; that they did occasionally have their quarrels but he never mistreated her; that he did once slap her face when a letter came from her mother abusing him; that he has his faults but they are such faults as are common to human beings; that his wife is faithful, is a good housekeeper; that he has always wanted her to live with him and that she is welcome now. The two sons testified and related no circumstances of mistreatment of plaintiff by defendant.

The sole contention of the plaintiff upon this appeal is that the evidence is sufficient to both warrant and require a finding of extreme cruelty on defendant's part.

The learned trial judge, in a memorandum statement at the conclusion of the trial, stated to the general effect that many of the incidents related occurred years ago in the married life of the parties; that the troubles, thus aired in court, appeared almost trivial; that intermeddling of plaintiff's relatives was largely the basis of the troubles between them; that the home life of the parties was not bad when outside meddling did not occur; that there was a paramount duty imposed upon the parents, not inhibited by acts of the defendant, for themselves, for their children and for society, to maintain the home; that, under the circumstances, the evidence was insufficient to justify any divorce. It is sufficient to state that many of the incidents related by plaintiff concerned scolding and temper displayed by defendant. Some of these incidents, as related by plaintiff, are indeed trivial; such, for instance, as finding fault with plaintiff because she went to the Ladies' Aid or with the manner in which she did cooking. Much of this scolding and temper arose by reason of plaintiff's visit to her parents and relatives and on account of the actions and feelings of her parents and relatives towards defendant. The charges of infidelity are wholly uncorroborated; they did not cause the plaintiff to leave defendant; she lived with him thereafter; they had their source in one of their wordy quarrels. For instance, at one time plaintiff came home from church without her husband. He thought she had gone home with the hired man.

Upon the evidence it is more or less apparent that plaintiff has a temper as well as defendant. Plaintiff's temper apparently has not been ameliorated or softened towards her husband by any acts of her parents and relatives.

Upon the record, furthermore, it is certain that a reconciliation took place between the parties some six years after they were married and the plaintiff returned and lived with defendant for some five years more. Many of the acts of cruelty related by plaintiff in her testimony occurred during these first six years. There can be little question that condonation took place concerning such acts. It is particularly noteworthy that when plaintiff last left the home and the defendant for the purpose of visiting her relatives she had no intention then of leaving the defendant on the grounds of cruelty or upon any other ground. At that time she intended to return and the only reason why she did not return, pursuant to her own testimony, was because defendant did not write to her and did not advise her that he would meet her; although, in fact, he did go to town for the purpose of meeting her after she had advised the children that she would return upon a certain day. The fact further appears in the record that she formed this intention to start this divorce action after she visited her relatives.

The trial court, with the parties before them, possessed a superior opportunity to observe the plaintiffs and weigh all conflicting testimony. McBride v. McBride, 43 N. D. 328, 174 N. W. 870; Johnson v. Johnson, 46 N. D. 606, 180 N. W. 794. Upon this record we are not disposed to overturn the findings of the trial court. It does appear that the marital life of these parties may continue well composed and adjusted if each will seek, in good faith, to perform their marital vows and try to provide for the children a home worthy of the name. In this respect parents and relatives of plaintiff may render, if they will, real and worthy assistance. Sad enough it is, in the marital life of those parties, that the great love once evidenced openly, still clinging in the shadowed depths, should thus prove the cause of woe. The judgment is affirmed.

NUESSLE, BIRDZELL, and CHRISTIANSON, JJ., concur.

JOHNSON, J. (dissenting). This is an action for divorce upon the

ground of cruelty. After hearing the evidence, the trial court announced immediately that a decree would be refused the plaintiff. A judgment was entered accordingly and the plaintiff appeals, demanding a trial de novo.

The parties were married in 1911 and for some time thereafter resided on a farm in Barnes county. They thereafter moved to Wells county, North Dakota. In June, 1922, the plaintiff left her husband and went to her mother's home in Valley City and shortly thereafter brought this action. There are four children, ranging from four to ten years of age. Two of the oldest testified at the trial. Their testimony, however, is of little value, consisting entirely of monosyllabic answers in the form of "yes" or "no" or a statement that they could not remember. At the time of the trial, the two younger children were in the custody of the plaintiff and the older two in the custody of the defendant.

There is little dispute upon the main facts. The parties appear to have been quite candid and, at least in some particulars, apparently quite fair one to another upon the witness stand. The plaintiff stated that her husband had been a good provider and that they had a home about which she made no complaint. The defendant testified that his wife was a good housekeeper, a fairly good cook, and otherwise he had no serious complaint to make. Plaintiff further said that at one time when she was ill in a hospital defendant treated her decently and kindly.

Plaintiff testifies, in substance, that her husband was ill-tempered and a chronic scold; that he upbraided her continually for incompetency as a housekeeper, as a cook, and as a manager generally; that on different occasions he slapped her and at least once kicked her out of bed; that he alarmed her considerably by insisting on keeping a loaded gun in close proximity to his bed and in fact that he sometimes took the gun to bed with him and kept cartridges or shells for use therein within convenient reach. She further testified that he violently objected to her visiting her mother and her relatives; a hired man testified that the defendant, in order to prevent plaintiff from going away, put a padlock on the family buggy when he was not at home; it further appears that after she visited her parents he ordered her to stay away, although, on at least some of these visits, she had her own money

and paid out of her own funds whatever expense was incidental to the visit. Perhaps the most serious grievance testified to by the wife was the continued and apparently groundless accusation by the husband that the children of the marriage were not his own and that she had been, on numerous occasions, unfaithful to her marriage vows. The defendant, on cross-examination on this point, admitted that he had made remarks in the presence of others which he did not intend should have the construction put upon them. His denial is not conclusive. It further appears from the testimony of a school teacher who roomed at the family home that on one or two occasions the plaintiff fled to her room and remained over night and that this teacher heard the defendant engaged in angry talking, altho she could not distinguish the words. About six years after the marriage, plaintiff left the defendant with the determination never to return. The defendant thereupon went to the plaintiff at her mother's home and, on his knees, with protestations of love and a solemn promise to reform, begged her to come back. She returned upon condition that he would in fact reform, which she says he did not. Her testimony is to the effect that he promptly resumed his course of misconduct, which theretofore had caused her to resolve to leave him and that there was no improvement and no indication of reform. She left him in 1922, not intending at that time to remain away permanently, but he did not answer a card written her son stating when she expected to return, did not meet her at the railway station, and it seems that this was the last straw.

The record shows that defendant used a buggy whip to beat one of the children, at that time about two years of age, about the bare legs, in order to "scare him home and break him," as defendant puts it, of the habit of going out into the road. This was in the presence of the mother. Defendant admits that on at least one occasion he did slap the plaintiff, but as to whether or not he slapped her several times, as she testified, he says he cannot remember. Defendant admits that he has faults, but says he has striven hard to correct them and thinks he has sued for forgiveness on all occasions when his faults threatened the harmony of the home. Defendant does not blame plaintiff's mother or relatives for the plaintiff's determination to leave him the first time, but admits that he was to some extent at fault. The testimony of the plaintiff that the defendant several times, particularly subsequent to

the attempted reconciliation in 1916, accused the plaintiff of gross infidelity, asserting that he knew that he was not the father of the second or the fourth child; that he did not know when another child might be born, whose paternity he would have to deny. He opened her mail, it seems, and found a letter from her mother which he says contained uncomplimentary references to himself. This plaintiff denies. The school teacher testifies that sometimes he would throw things from the table; that on one occasion defendant became peeved over a trivial matter, threw out the milk and would not give the family milk for about two weeks. One Lund, who worked for defendant, says he was abusive towards plaintiff, would scold her all the time; that he never heard defendant speak a civil word to plaintiff while the witness worked for the defendant; that the defendant refused to permit plaintiff to see her mother shortly after plaintiff came from the hospital; that defendant then put a padlock on the buggy so that plaintiff could not go away; that in the spring of 1922, plaintiff was suffering from rheumatism and, although unable to work, defendant forced her on a rainy day to sort a wagon load of potatoes in the rain. Defendant does not deny these charges, but takes the position, in general terms, that the cause of the trouble was interference from relatives of the plaintiff. Defendant does not deny that he kicked his wife out of bed, but in effect pleads somnambulism. He thinks he might have thrown her out in his sleep. He admits that he has been "grouchy" at times, but his outbursts of ill-temper and his request made to his wife, that she shoot him he claims were due to the fact that he was suffering from pains in his leg and that things did not go always as they should.

I am unable to find any substantial evidence in the record or in the testimony of any of the witnesses to any specific facts indicating interference in the affairs of this family from relatives of the plaintiff from which the difficulties that resulted in this action can fairly be said to have sprung. It is undeniably true, and the record conclusively shows that the plaintiff, after the course of nagging, accusations of infidelity and physical violence had become unbearable, sought refuge in her mother's home; it is probably true that the mother, upon being apprised of the domestic infelicity of her daughter, took up her quarrel and, to some extent, made it her own. Who shall say that the mother's home should be closed against her daughter when the husband makes life

unbearable for her in the new relation? Must she close her heart against the daughter who flees from a husband's brutal treatment? It is too much to ask. The law does not demand it; human nature finds the suggestion wholly revolting. There is nothing in the record to indicate that prior to the time of the attempted reconciliation in 1916 there was any interference from the mother or the relatives of the plaintiff which in any way tended to bring about the breach; the defendant himself confessed by his conduct on that occasion a measure of responsibility for the decision of the plaintiff to abandon him by going to her at her mother's home and begging that she return. I think the record supports the view that such encounters as took place between the defendant and plaintiff's mother or other relatives were all subsequent to and the outgrowth and natural result of the misconduct of the husband towards the wife. There is nothing in the record from which it can be said that there was a willful attempt on the part of any of plaintiff's relatives to alienate the affections of the daughter from her husband.

I find myself wholly unable to agree with the statement made at the close of the trial by the court below that the facts and incidents related, extending over a period of many years, were of a trivial character. In the hurry of the trial, I can well understand how the full import of some of the testimony was not completely appreciated by the trial judge. It is no reflection upon his learning as a judge or his sentiments as a man, should members of this court, who peruse the record at leisure, find themselves in disagreement with him. It is in spite of a very high regard for the trial judge and a natural reluctance to find myself out of harmony with his views, that I have reached a contrary conclusion in this case.

It is undisputed that the defendant struck the plaintiff, apparently without cause, if it may be assumed that justifiable cause can ever exist for the infliction of corporal injury by one spouse upon the other; and it is not denied by the defendant that he several times slapped the plaintiff. Happily the law of this state recognizes no right in the husband to administer corporal chastisement upon the person of his wife. I am not willing to agree that assault and battery may be committed by the husband upon the wife and that when she appeals to the courts for redress the conduct of her husband shall be held to be trivial.

One such assault is sufficient, as a matter of law, to justify a separation. See Slinnan v. Sliman, 155 La. 397, 99 So. 343. Her testimony is undisputed that on numerous occasions, and especially since the attempted reconciliation, the defendant made the most serious charge against the plaintiff that can be preferred by one spouse against the other. The evidence shows that he accused her repeatedly of violating her marriage vows, of conduct made criminal by the laws of this jurisdiction. It is difficult to conceive of any course of conduct that can cause greater pain, a greater agony of the soul, than accusations of that sort made against a woman of fine sensibilities and feelings. Physical violence, while painful when inflicted, time will heal; the wounds soon cicatrice and the injury as well as the humiliation are forgotten; but the injury to the sensibilities and feelings inflicted by charges so heinous and cruel as those made by this defendant against the plaintiff, the healing touch of time is powerless to remove. It is not a poetic fancy, but a profound philosophic truth that too often no art, nor even time's reputed healing power, can "pluck from the memory a rooted sorrow, raze out the written troubles of the brain." I am not willing to subscribe to the doctrine that accusations of that sort, repeatedly made without even a shadow for a foundation, shall be considered trivial when the distracted wife appeals to the courts for protection. This court has held that conduct may constitute cruelty, as that ground of divorce is defined in our statutes, although unaccompanied by physical violence. This court has recognized the doctrine, much more in keeping with advancing civilization and a juster and more exalted view of the marriage relation, that there may be extreme cruelty, within the statutory definition, resulting from a course of conduct calculated to wound the feelings and the sensibilities of a spouse. Mosher v. Mosher, 16 N. D. 269, 12 L.R.A.(N.S.) 820, 125 Am. St. Rep. 654, 113 N. W. 99. It is said in the syllabus of this case: "A continuous course of fault finding, threats and other acts intended to aggravate and annoy the other party to a marriage, tho each is trivial in itself, may cause such a degree of mental suffering as to constitute a ground for divorce on the charge of extreme cruelty." Certainly the defendant cannot justify the conduct towards the plaintiff detailed by the witness Lund, by the school teacher and by the plaintiff upon the ground of parental interference. Interference from relatives may, of course, cause a bit-

terness of feeling that will erupt in angry words, but no reasonable man can say that accusations of the sort appearing in this record, made by the husband against the wife, can be said to be the natural and reasonable result of parental interference in the affairs of the home. For the falsity and for the effect of such accusations the defendant must accept full legal responsibility. I think the record amply justifies the finding that during a period of years, in fact, during most of the married life of the parties, the defendant has been guilty of a course of conduct towards the plaintiff, calculated to cause such a degree of mental suffering as to amount to extreme cruelty.

While the point is not made by counsel for respondent, it is proper to advert to the fact that there is ample corroboration of plaintiff's testimony. The purpose of § 4400, Comp. Laws. 1913, requiring corroboration before divorce may be granted, is primarily to preclude the possibility of collusive decrees. Clopton v. Clopton, 11 N. D. 212, 91 N. W. 46; Thompson v. Thompson, 32 N. D. 530, 156 N. W. 492. The suit has been strenuously contested by the defendant at every stage. Crum v. Crum, 57 Cal. App. 539, 207 Pac. 506. There is no suspicion of collusion in this case. Corroboration, therefore, may be very slight and yet sufficient. Thompson v. Thompson, supra.

It is not strictly correct to say that the testimony of the plaintiff, with respect to the accusations of infidelity, has no corroboration in the evidence, other than the implied admissions of the defendant himself. Defendant seeks to explain an occasion on which he evidently made such a charge in the presence of strangers, but testifies that when he reached home, he stated, in substance, to her that he had "caught her." The school teacher corroborates the plaintiff on the point that plaintiff fled from their bedroom in the dead of night because of physical violence at the hands of the defendant. Lund corroborates plaintiff's general and, circumstantially, her specific allegation of cruelty when he says he never heard defendant speak a civil word to the plaintiff, and that defendant forced her, when ill, to work outside in inclement weather. It is not always easy to corroborate testimony as to charges of infidelity. A crafty spouse will make those charges in the privacy of the domestic circle and in the absence of witnesses. Under such circumstances, the courts have generally held that very slight corroboration is necessary. Thompson v. Thompson, and Crum v. Crum, supra.

50 N. D.—45.

In the case at bar, the testimony of the plaintiff is corroborated by circumstantial evidence, which is undisputed, particularly in so far as it discloses a cold and harsh attitude towards the children, showing the cruel, unsympathetic disposition of the defendant.

In Clopton v. Clopton, supra, this court had under consideration the interpretation of § 4400, Comp. Laws 1913, with particular reference to the extent of corroboration required thereby. The court in that case follows the California decisions, construing the statute of that state, which Dakota Territory borrowed and which is § 4400, supra. It is there said that corroboration "need not extend to every feature of the matrimonial offense;" that the statute does not require "that every element and ingredient of the matrimonial offense must have support of evidence other than the admissions or testimony of the parties." In Andrews v. Andrews, 120 Cal. 184, 52 Pac. 298, the supreme court of California say: "Where divorce is sought on the ground of extreme cruelty, it is not necessary that there should be direct testimony of other witnesses to every act sworn to by the plaintiff, but it is a sufficient corroboration if a considerable number of important and material facts are testified to by other witnesses, or if there is other evidence, circumstantial or direct, which strongly tends to strengthen and confirm the statements of the plaintiff."

This is a case properly triable de novo and a trial de novo is demanded. The rule established by the decisions of this court seems to be that in a case properly triable to the court without a jury, and wherein a trial de novo may be had and is demanded in this court, the facts are reinvestigated and the evidence weighed to ascertain whether the findings are or are not in accord with the weight of the evidence. See Jasper v. Hazen, 4 N. D. 1, 23 L.R.A. 58, 58 N. W. 454. Where the testimony is oral and not documentary or upon stipulated facts, there are necessarily many matters which can not appear upon the record. The demeanor of witnesses is a vitally important factor in weighing their credibility. The expression of the face, the quiver of a lip, or the glance of an eye may tell more than pages of testimony or may disclose beyond question to the trial judge that the testimony is false. I am not unmindful of this rule or the reasons on which it is founded. It is evident, to my mind, after reading the record, and particularly the statement dictated into the record at the conclusion

of the trial by the trial judge, that, while the trial judge may possibly have been influenced in his decision by the demeanor of witnesses not reflected on the printed page, probably the main and controlling reason in his mind arose from a very substantial misconception and mistake as to the evidence. In the first part of his statement, in fact, in the second sentence thereof, the trial judge says: "The most striking feature of this case is that most of the acts complained of happened in Barnes County about six or seven years ago." If that were in harmony with the facts, it would indeed be conservative to say that the bringing of a divorce action at this time would be "striking" and would certainly require explanation. I think the record fairly shows that the learned trial judge was in error in this regard. It is true that physical violence had been committed upon the plaintiff while she lived in Barnes county, about six years before the trial, and that she left him because of his intolerable conduct at that time and returned only upon condition that he reform. The plaintiff was asked this question: "Most of these troubles that you have described here are prior to six years ago, are they not? A. This, all this slapping and kicking business was new, and he also accused me of infidelity, and also that he has not been the father of the children. *That has been said more since we came up here than before.*" (The parties left Barnes county about six years before.) The testimony of the school teacher as to the incident when the plaintiff was kicked out of bed by the defendant shows that that happened during the period she roomed at their home, 1919–1921; this case was tried on February 3, 1923; again she says that "a year ago last fall" the defendant slapped her in the face in the house.

There is, of course, no question of condonation in this case. The testimony shows that the defendant pursued a course of ill treatment towards the plaintiff subsequently to the time when she returned to him. Sections 4391, 4392, Comp. Laws, 1913, expressly provide that condonation is conditional and is revoked when the guilty party commits acts constituting a like or other cause of divorce. Section 4391 provides that "when the cause of divorce consists of a course of offensive conduct, or arises in cases of cruelty from successive acts of ill treatment, which may aggregately constitute the offense, cohabitation, or passive endurance, or conjugal kindness shall not be evidence of

condonation of any of the acts constituting such cause, unless accompanied by an express agreement to condone." The record shows that the return of the plaintiff to the defendant was conditional upon his reforming and the record, to my mind, clearly indicates that he did not reform. The plaintiff indeed testifies that he told her that he promised to reform simply in order to induce her to return.

It is evident that the defendant was a careful, calculating witness. It is to my mind, extremely probable that her statement is true when she says that he was very "nice" to her when other persons were present. His testimony and his explanations are full of the worldly wisdom that is the twin brother of guile.

I am not insensible to the evil effects of separation or divorce upon the children of the marriage. It is doubtless true, in many cases, that in the last analysis those who suffer most when a family is sundered are the children who are innocent of wrong. Much has been said on this subject and no useful purpose would be served by a protracted discussion. Suffice it to say that the legislature has recognized the right to a divorce on the ground of extreme cruelty; and that it is at least a debatable question whether it is not as well for the child that the parents should permanently separate, as that it should be brought up in a home without love, where quarreling and physical violence between those who solemnly promised to love and cherish each other, are the rule.

The judgment of the trial court should be reversed and a decree of divorce should be granted the plaintiff.