[File No. 7341]

MADELINE FLECK, Appellant, v. MARCUS FLECK, Respondent.

(58 NW2d 765)

 

Opinion filed May 15, 1953

*Hyland & Foster,* for appellant.

*Sullivan, Kelsch & Scanlon,* for respondent.

GRIMSON, J. This is an action for divorce. Plaintiff asks for a divorce from her husband on the grounds of cruel and inhuman treatment and for support and division of property. The defendant denies the cruel and inhuman treatment generally and filed a cross complaint asking for a divorce on the grounds of cruel and inhuman treatment on the part of the plaintiff. Plaintiff makes reply denying defendant's cross complaint generally. The district court denied divorce to both parties and denied support to the plaintiff. Plaintiff appeals and asks for a trial de novo.

The plaintiff and defendant were married at Wibaux, Montana, on Jan. 25, 1947. Both are citizens of the United States and bona fide residents of the State of North Dakota for more than one year next preceding the commencement of the action. Both had been married and divorced. No children were born to this marriage.

At the time of the marriage the defendant owned a building located on West Main St., Mandan, North Dakota, in which he conducted a bar. After the marriage the main room of that building was divided along the center and a restaurant established on one side while the bar was maintained on the other. The plaintiff operated the restaurant while the defendant operated the bar. The plaintiff kept the books. In 1948 defendant bought lots on East Main St., in Mandan and the parties cooperated in the construction and operation of a motel court thereon.

The testimony by the plaintiff and in her behalf shows that trouble soon arose between them. In September 1947 plaintiff's father was ill in a Minneapolis Hospital. The family de-

cided to go down to see him. Plaintiff wanted to go along. The defendant refused to give her permission. She went anyhow. When she, in 1949, wanted to go to see her father who was again in the hospital, defendant again refused and said: "If you go, don't come back." She went anyhow and when she came back he said: "What do you want . . . I told you not to come back." He accused her mother of immoral conduct and called her bad and indecent names. The defendant forbade the plaintiff to associate with her people. He called them "hillbillies" and other derogatory names. He did not want her to allow them to come to their home and at one time after defendant had seen her mother coming from their home he said: "If I ever catch her up here I will throw her down the stairway and break her — — neck." He repeatedly told plaintiff when she was going with her people: "If you go, don't come back." He made her wash the telephone when her sister had used it. He refused to let her go home for Father's Day until a friend intervened. At the time of one of the Minneapolis trips when her sister, Mrs. Chadwick, was urging defendant to let her go and on his refusal called him a "slave driver" he got mad, called her a bad name and said: "Are you going to get out of here?" This attitude of the defendant towards plaintiff's people seems to have continued throughout their entire married life. This is not only the plaintiff's testimony but is corroborated by her sisters and by a maid who worked in the motor court. Defendant's own testimony is somewhat of an indirect admission along that line. He says: "We didn't quarrel so much about them but what I wanted was reasonable visiting. . . . Q— Now you heard Mrs. Chadwick testify that you told your wife that she could not go up to the bars to slut around or words to that effect? Ans.— I did not say that, not that word."

It is clear that the defendant had a strong antipathy towards plaintiff's relatives and used every effort to keep her from any association with them. Plaintiff, on the other hand, seems to have had a strong attachment for her relatives and desired their company. The conduct of the defendant in that regard was unreasonable: In Gratz v. Gratz, 137 Fla 709, 188 So 580, it is said: "There seems to have been an abundance of testimony to

show repeated declarations by the appellant execrating appellee's parents and applying to them humiliating and profane epithets. These expressions, at a time when the domestic atmosphere was far from tranquil, were obviously intended to injure her sensibilities and cause her mental distress." The court held such conduct warranted granting the wife a divorce on the ground of extreme cruelty. In Donald v. Donald, 21 Fla 571, it is said that abuse and mistreatment of her relatives far exceed the effect of a blow in their damaging effect upon the health and happiness of a woman. See also 17 Am Jur Divorce and Separation, Sec 71, p 185.

Apparently defendant was jealous of her. When she went out alone he admits he watched her to see where she went and what she did. He frequently accused her of being with other men. He claimed she continually flirted with the customers at the restaurant and visited barrooms with some of them. Of defendant's testimony on these claims the trial court found that "The evidence discloses that it is based mostly on conjecture and suspicion and is not corroborated in any manner." Plaintiff claims defendant accused her of infidelity, which he admits, and that he called her the most indecent names possible indicating infidelity. Her sisters and a maid testify they heard him do that. Defendant admits calling her a "chippy." Defendant offered no evidence to justify such charges.

"Unfounded accusations of infidelity may inflict such grievous mental suffering as to amount to extreme cruelty." Ruff v. Ruff, 78 ND 775, 52 NW2d 107 and cases cited.

"As a general rule, unfounded accusations of misconduct, tending to degrade and humiliate the accused spouse may warrant a divorce for cruelty." 27 CJS, Divorce, Sec 28 b p 555. See also 17 Am Jur, Divorce and Separation, Sec 66, p 183.

The handling of their finances and her management of the restaurant seem to have been matters of continual bickering between them. Plaintiff claims she could never do anything to please him. Both drank some intoxicating liquor which made matters worse. Plaintiff claims defendant abused her for wanting to go to church. When she at one time went anyhow he became so angry over it that he pounded his desk, broke a glass

and threw a shoe at her. Another time when she came back from Bismarck with some friends and was drinking beer with them in her home he slapped her in the face, leaving a little mark and pushed her off the chair. Her glasses were knocked off.

In a proposed written agreement for a condonation, which defendant signed and unsuccessfully sought to have plaintiff sign, it is stated:

"Whereas, the parties hereto have had some serious marital difficulties during the time of their marriage, which have been occasioned by and are due: "(1) to occasional quarrels during which the party of the second part (the defendant) called the party of the first part, (the plaintiff) vile and insulting names; (2) to conduct towards each other which at times has been unkind, unfair and cruel; (3) to the use of force by the party of the second part (the defendant) on the party of the first part (the plaintiff) on one occasion when he slapped her in the face."

Thus defendant admits calling plaintiff names and slapping her. On his part he admits unkind, unfair and cruel treatment towards plaintiff. She refused to sign this document.

"It is generally held that where occasional acts of physical violence are resorted to by a spouse in connection with the continued use of vile and offensive language, the entire course of conduct will constitute cruelty although the physical violence is not sufficient standing alone to warrant a divorce." 17 Am Jur, Divorce and Separation, Sec 62, p 181; Doolittle v. Doolittle, 78 Iowa 691, 43 NW 616, 6 LRA 187. See also annotation in Ann Cas 1918B 489 and cases cited.

Plaintiff claims this conduct on the part of the defendant continually upset her, caused her mental worry and distress; that it made her nervous and that she suffered continual headaches therefrom for which she had to take medicine. She claims to have been in fear of him and was corroborated on that by a maid. All this conduct on defendant's part would naturally tend to affect plaintiff's health and happiness. Plaintiff's evidence establishes a cause for divorce.

Defendant argues that there is not sufficient corroboration of plaintiff's evidence. This court has held that the statute requiring corroboration must be interpreted in the light of its

purpose. The reason for that statute is said to be for the prevention of collusion. Clopton v. Clopton, 11 ND 212, 219, 91 NW 46. In Tuttle v. Tuttle, 21 ND 503, 518, 131 NW 460, Ann Cas 1913B 1, this court approves that conclusion in Clopton v. Clopton and holds that: "Where the whole case precludes any possibility of collusion, the corroboration need be slight." See also Thompson v. Thompson, 32 ND 530, 156 NW 492. Clearly there was no collusion in the case at bar. We find the evidence sufficiently corroborates plaintiff's testimony.

Plaintiff had left defendant three of four times. In spite of his injunction to her on such occasions not to come back she had come back. The last of these occasions was in December 1950. She went to her folks. In a few days defendant persuaded her to come back. She then lived with him as his wife until August 24, 1951. It is claimed and the district court found that this amounted to condonation of all past causes for divorce.

Section 14–0513 NDRC 1943 provides:

"Condonation is the conditional forgiveness of a matrimonial offense constituting a cause of divorce. The following requirements are necessary to condonation:

1. A knowledge on the part of the condoner of the facts constituting the cause of divorce;

2. Reconciliation and remission of the offense by the injured person; and

3. Restoration of the offending party to all marital rights.

"Condonation implies a condition subsequent that the forgiving party must be treated with conjugal kindness. *When the cause of divorce consists of a course of offensive acts of ill treatment, which aggregately may constitute the offense, cohabitation or passive endurance, or conjugal kindness shall not be evidence of condonation of any of the acts constituting such cause, unless accompanied by an express agreement to condone.* In such cases, condonation can be made only after the cause of divorce has become complete as to the acts complained of. A fraudulent concealment by the condonee of facts constituting a different cause of divorce from the one condoned and existing at the time of condonation avoids such condonation." (Italics supplied.)

This statute was considered in Taylor v. Taylor, 5 ND 58, 63 NW 893, and the court reached this conclusion, stated in the syllabus:

"In an action for divorce on the ground of cruelty, cohabitation after such cruelty does not establish condonation, in the absence of an express agreement to condone."

In this case the evidence establishes a ground for divorce on behalf of the plaintiff that comes squarely within the italicized portion of the above statute. The defendant over a period of several years pursued a course of cruel and offensive conduct toward the plaintiff which constituted grounds for divorce under Sections 14-0503 and 14-0505 NDRC 1943.

The trial court found as a fact:

"That the defendant upon cross-examination of the plaintiff established the fact that the plaintiff had left the defendant just before Christmas in 1950, that she returned to him during the holidays, and lived and co-habited with him from January 1st, 1951 to August 24th, 1951, when she left him and lived separate and apart from him; that from January 1st, 1951 up to the time she left him on August 24th of the said year, the parties did not have any serious trouble, and the Court finds that during said time the plaintiff with knowledge of the defendant's conduct towards her and all of the acts and things which she has complained of condoned such acts and conduct of the defendant committed prior thereto, upon which she has relied for divorce upon the ground of extreme cruelty, and that the plaintiff and the defendant became reconciled and thereafter lived and co-habited together from January 1st, 1951 to August 24, of said year when she left him to live separate and apart from him."

The court then reached this conclusion of law:

"That the conduct and acts of the defendant upon which the plaintiff relied for a divorce on the ground of extreme cruelty were condoned by the plaintiff with full knowledge of all of the material facts and attending circumstances, that the parties became reconciled during the Christmas holidays of December, 1950, and that they lived and co-habited together as husband and wife from January 1st, 1951, to August 24th, of the same

year when plaintiff left the defendant, and has lived separate and apart from him since said time."

In reaching his conclusion, it is apparent that the trial court overlooked our statutory declaration with respect to condonation in cruelty cases. There is no evidence of an express agreement to condone. Under cross-examination to which the court refers, the plaintiff testified that shortly before Christmas in 1950 she went to the home of her parents after the defendant had told her to get out. Shortly thereafter the defendant came out to see her. On one occasion he was alone and on the other he was accompanied by his attorney. On the first visit she refused to return with the defendant. On the second visit she returned after the defendant and his attorney made a lot of promises. She does not say what the promises were, but says: "I didn't believe it but I thought I would try it." After the holidays she came back to live with the defendant and lived with him up until August 24, 1951. During that time they had a "lot of arguments" over her relatives. She left again after a quarrel on August 24, 1951, as a climax of repeated arguments and continual nagging all that summer.

Condonation of cruelty resulting from a course of conduct over a considerable period of time stands on a different basis than condonation of grounds for divorce consisting of a single act, as, for instance, adultery. 17 Am Jur, Divorce and Separation, Sec 210, p 257; Annotation in 14 ALR 933. A number of states have statutes the same or similar to our Section 14-0513 NDRC 1943 requiring an express agreement to establish condonation in certain cases of cruelty. Under a California statute very similar to ours an express agreement to condone is held necessary to support a finding of condonation. Shaingold v. Shaingold, 191 Cal 438, 216 Pac 603; Whinnery v. Whinnery, 21 Cal App 59, 130 Pac 1065; Hunter v. Hunter, 132 Cal 473, 64 Pac 772; Smith v. Smith, 119 Cal 183, 48 Pac 730, 51 Pac 183; Morton v. Morton, 117 Cal 443, 49 Pac 557; Johnson v. Johnson, 4 Cal Unrep 446, 35 Pac 637. "In an action for divorce on the ground of cruelty there can be no condonation unless there is a reconciliation between the parties, a remission of the matrimonial

offenses, and an express agreement to condone." Morton v. Morton, supra.

In Saville v. Saville, 103 Ore 117, 203 Pac 584, it is said:

In this state condonation of a matrimonial offense, except adultery, cannot be established by implication from the voluntary co-habitation of the parties after knowledge thereof. To constitute a bar for any of the causes of divorce named in the statute, except adultery, the offense must have been expressly forgiven. . . .

"The defendant did not allege, or attempt to prove, that plaintiff had expressly forgiven the acts of cruel and inhuman treatment, which he admitted he inflicted upon her; he relied entirely upon forgiveness which he urged the court to imply from the fact of marital cohabitation continuing for some time after the acts of cruelty were committed. This the court is not permitted to do in view of the statute, and accordingly plaintiff was not barred from obtaining a decree of divorce based on the acts claimed by defendant to have been condoned."

That case was later cited with approval in Claude v. Claude, 180 Ore 62, 174 Pac2d 179; Brennan v. Brennan, 183 Ore 269, 192 Pac2d 858; and Hollingsworth v. Hollingsworth, 191 Ore 374, 229 Pac2d 956.

Without referring to statutory provisions, the Supreme Court of Wisconsin, in Cudahy v. Cudahy, 217 Wis 355, 258 NW 168, has this to say:

"While cruel and inhuman treatment may be condoned, there is quite a difference between cruel and inhuman treatment consisting of a long succession of relatively trivial incidents, the whole pattern of which may constitute a ground for divorce, and single acts such as adultery or assault which, taken alone, may constitute grounds for divorce. By hypothesis, the conduct of defendant would not in any of its single instances constitute a ground for divorce. It was the continuity and the persistence of this conduct that ultimately gave plaintiff a cause of action. If marital intercourse or continued living together is to be treated as condonation, then a spouse who hopes for improvement in conduct, and continues marital relations in the hope that things may eventually straighten out, is, by the very act of toler-

ance, barred from securing a divorce. On the other hand, should the spouse, after one or two instances of such conduct, sue for divorce, he or she would be met with the argument that one or two instances of this sort do not constitute grounds for divorce. The doctrine of condonation was not intended to create such a dilemma. It has no application here. Even if it did have, it would be a conditional forgiveness and subject to the implied condition that the conduct shall not be repeated and that the cause of action shall be revived by conduct much slighter than that which preceded it." See also Bickford v. Bickford, 94 Mont 314, 22 Pac2d 306; Quient v. Quient, 105 Wash 315, 177 Pac 779; McCarthy v. McCarthy, 123 Conn 409, 195 Atl 607.

In the case at bar condonation was not pleaded and does not seem to have been relied upon as a defense. The defendant gave no testimony tending to establish an express agreement in compliance with our statute and no such agreement is established by the testimony of the plaintiff, either on direct or cross-examination, or by any other evidence. The trial court was clearly in error in disregarding the requirements of the statute and in finding that plaintiff's cause of action for a divorce was destroyed by condonation which was neither pleaded nor established by the evidence.

We have concluded that the plaintiff has proven by a preponderance of the evidence that she has suffered continued cruel and inhuman treatment at the hands of the defendant. The legitimate ends and objects of this marriage have been destroyed.. This is indicated by the fact that both are seeking divorce upon identical grounds, towit: cruel and inhuman treatment. It is further shown by clauses 4 and 5 in the proposed agreement of condonation, heretofore referred to, which said the difficulties existing between them were occasioned by and due: "(4) to mutual accusations and distrust of each other's intentions; (5) to the fact that the party of the first part has left the home of the parties on several occasions for a short period of time by reason of the difficulties they had, after which she returned again to assume the marriage relationship." Here defendant admitted, by signing this document, his accusations and distrust of plaintiff's intentions and that the occasions when

plaintiff had left home were caused "by reason of the difficulties they had." While in the instant case violence was resorted to only once, defendant's conduct with the plaintiff in regard to her family, his use of abusive and vulgar language, his continual criticism of plaintiff's actions and his unfounded accusations of infidelity on her part were such that would necessarily cause any woman grievous suffering. While the plaintiff may not have been free from all fault the evidence does not justify defendant's conduct towards her. In Thompson v. Thompson, 32 ND 530, 156 NW 492, this court held that:

"Any unjustifiable conduct on the part of either husband or wife which so grievously wounds the mental feelings of the other as to seriously impair bodily health, or utterly destroy the legitimate ends and objects of matrimony, constitutes extreme cruelty within the meaning of the statute, although no physical or personal violence may be inflicted." See also Ruff v. Ruff, supra.

Plaintiff in her complaint asked that the defendant be required to pay "a suitable sum for plaintiff's support and that the property of plaintiff and defendant be divided into an amount to be decreed by the court . . . to be the property of this plaintiff." The defendant in his answer prayed "that the court determine the amount which the defendant, (1) should pay to the plaintiff as permanent alimony or for her support and maintenance and fix the time of payment, or (2) the amount which plaintiff should pay, in a lump sum, in full discharge of all his obligations arising out of the marriage relationship." These prayers were after each party had asked for a divorce. The district court made an order for the defendant to pay the plaintiff for her support during the pendency of the action, $25.00 per week. During the trial both parties fully submitted their evidence on the property owned by the parties at the time of their marriage and up to the time of the trial. After consideration of the whole case the court in its conclusions and order for judgment directed that this order for support be "in all things, annulled, vacated and set aside" and made no allowance whatever for the support of the plaintiff although she was then living separate and apart from the defendant. The appeal was taken

from the judgment and the whole thereof. In the briefs and on the argument the matter of property division was fully argued and submitted to this court. Plaintiff's request to this court is "that the plaintiff be awarded . . . division of the property."

In his brief the defendant states:

"The defendant concedes that if the court grants a divorce that then it has the power to make an equitable division of the property under the provisions of Section 14–0524 RC 1943. On this issue the defendant contends: (1) That the property which the defendant owned prior to his marriage to plaintiff is his own separate property and is not community property or subject to equitable distribution. (2) That the rents and profits or income derived from the rental of the property that he owned prior to his marriage to the plaintiff are not community property nor subject to distribution in this action. (3) That the income and money earned by the defendant since August 24, 1951 when plaintiff left him and during which time the parties have lived separate and apart is the separate property of the defendant and not subject to distribution. (4) That only the Motel Court, furnishings and appliances and Buick automobile constitute community property. (5) That only the equity in the community property: (a) after deducting the debts and obligations chargeable against it, and (b) after deducting the contribution which the defendant made from his separate property to the acquisition thereof, is subject to the equitable distribution by the court should a divorce be granted."

This court has under somewhat similar circumstances passed upon property rights in a divorce action. Henry v. Henry, 77 ND 845, 46 NW2d 701. See also Christianson v. Warehouse Association, 5 ND 438, 67 NW 300, 32 LRA 730.

In Ruff v. Ruff, supra, this court says:

"When a divorce is granted the court is required to make such equitable distribution of the real and personal property of the parties as may seem just and proper. Sec 14–0542 NDRC 1943, the distribution to be made depends upon the facts and circumstances of each particular case. Agrest v. Agrest, 75 ND 318, 27 NW2d 697. There is no rigid rule for the division of

property but the ultimate object to be sought is an equitable distribution. Byrne v. Byrne, 315 Mich 441, 24 NW2d 173; Casciola v. Casciola, 317 Mich 485, 27 NW2d 65; Jensen v. Jensen, 144 Neb 857, 15 NW2d 57; Caldwell v. Caldwell, 58 SD 472, 237 NW 568."

The evidence shows that at the time of the marriage of the parties the defendant was the owner of the property described as Lot 10 in Block 10 of the original townsite of Mandan, upon which was located a building in which he conducted a liquor business.

This building, the bar and the furnishings as well as the income therefrom are entirely the property of the defendant. The plaintiff did nothing in reference thereto to give her a share in that property or its income. Except for necessary support the wife has no interest in the property of her husband. Sec 14-0704 NDRC 1943. In Hill v. Hill, 82 Cal App2d 682, 187 Pac2d 28, the Supreme Court of California held, in effect, that the property which the husband acquired before his marriage remained his separate property, and since the wife had made no contribution thereto she was not entitled to receive a part thereof. In Burch v. Rice, 37 Wash2d 185, 222 Pac2d 847, the Supreme Court of Washington said:

"The rule is well settled in this state that the status of property as community or separate is to be determined as of the date of its acquisition, and that if it is separate property at that time it will remain separate property through all of its changes and transitions as long as it can be traced and identified; and, further, that its rents, issues and profits remain separate property." (And cases cited.) See also Schlak v. Schlak, 51 ND 897, 201 NW 832; Buchanan v. Buchanan, 69 ND 208, 285 NW 75; McLean v. McLean, 69 ND 665, 290 NW 913.

After their marriage defendant's barroom was divided so that plaintiff operated the restaurant on one side and he operated the bar on the other. The defendant sold the bar and fixtures for $11,000.00 and then rented the barroom to the purchaser for $125.00 per month. The fixtures and furniture of the restaurant were purchased and paid for out of the proceeds of the business. Plaintiff claims the cost thereof to have been $5000.00,

When the plaintiff ceased to operate the restaurant it was rented, together with furniture and fixtures, for $250.00 per month. There is no testimony as to what portion of that rent was for the building and what was for the furnishings. Defendant can, therefore, not claim any of that rent as separate property and it will all be treated as going into the building of their joint property—the motel court. The barroom rental is the property of the defendant without any right therein by the plaintiff.

In 1948, the parties jointly planned and constructed the motel court on East Main St. in the City of Mandan. Except what was contributed by the defendant as proceeds from the increase in the mortgage on the bar building and proceeds from the sale of the bar business and income from the rental of the barroom, the building of the motel court was mainly financed by loans and the credit of the defendant.

The evidence as to the value of the motel court is not very definite. The plaintiff claims that it cost $76,000.00 and basing the value on the net income in 1950, defendant claims that it was worth more than $100,000.00 at the time of the trial. Defendant claims that it cost about $64,000.00 and presented a statement in the evidence claimed to have been made from defendant's books to support that. He, however, admits that it was worth $70,000.00 at the time of the trial. We have come to the conclusion that the reasonable value of the motel court was $75,000.00. Another item on which there is a dispute in the evidence was on the value of the furniture and fixtures of the restaurant. Defendant claims that plaintiff's estimate of $5000.00 is too high. Moreover, the property had been used almost four years at the time of the trial and such property depreciates fast. The court, therefore, finds the value of that property to be $2500.00 at the time of the trial.

On that basis the evidence shows the following as the value of the joint property of the parties at the time of the trial:

| | | |
|---|---:|---:|
| Value of the Motel Court, | | $75,000.00 |
| Indebtedness and deductions: | | |
| Bal. due on first mortgage, | $18,833.00 | |
| Bal. due on second mortgage, | 5,000.00 | |
| Due Kennelly Furniture Co. | 1,650.00 | |
| Due Montgomery Ward Co. | 195.00 | |
| Real estate taxes due, | 1,708.10 | |
| Personal property taxes, | 222.60 | |
| U. S. Government tax liens, | 8,181.00 | |
| Interest on income taxes, | 228.30 | |
| Proceeds from increase in mortgage on bar building, | 7,500.00 | |
| Proceeds from sale of bar business, | 11,000.00 | |
| Income from barroom rental, | 1,190.00 | |
| Total, | $55,708.00 | 55,708.00 |
| Net value of Motel Court, | | $19,292.00 |
| Furniture and fixtures of restaurant, | $2,500.00 | |
| Other joint property, | 1,410.00 | 3,910.00 |
| Total, | | $23,202.00 |

On this basis the net value of plaintiff and defendant in their joint property is $23,202.00. The question then arises what is an equitable division thereof according to the facts and circumstances in this case?

As to the plaintiff the evidence showed that she is a young woman of 36 years of age; that since her separation from the defendant she has recovered her good health; that she is a good cook and trained for the management of a restaurant, of fair earning ability and is capable of earning her own living; that she has been working in a restaurant since the commencement of this action; that there are no children; that although about 30 years of age at the time of this marriage she had nothing to contribute to the accumulation of the property except her labor

and help in planning and management. There is also the fact that this marriage has lasted less than five years and that the plaintiff is not entirely blameless for its failure.

On the other hand the evidence shows that defendant is a middle aged man in good health; that he owned property at the time of the marriage from the proceeds of which, together with defendant's credit the parties were enabled to construct this motel court; that his work and his credit standing have been worth considerable more in the building of the motel court then everything plaintiff contributed; that the motel court is heavily encumbered on which indebtedness there are installments of over $1100.00 due each month; that the project still needs his credit standing to succeed; that for his actions against plaintiff he had some provocation on her part.

All these matters enter into a determination of what is an equitable division of the property. See Ruff v. Ruff, supra; Agrest v. Agrest, 75 ND 318, 27 NW2d 697; Holmes v. Holmes, 152 Neb 556, 41 NW2d 919; Ristow v. Ristow, 152 Neb 615, 41 NW2d 924.

The court is of the opinion that under the circumstances of this case the division of the joint property of the plaintiff and defendant should be made on the basis of one-third to the plaintiff and two-thirds to the defendant. The property cannot be divided so that it is the conclusion of this court that the defendant in lieu of all support and alimony pay to the plaintiff the sum of $7,734.00, being one-third of the net value of the joint property, with interest at 4 per cent from the date of the final judgment herein and payable, $534.00 within thirty days of the date of the final judgment, $1200.00 on or before Oct. 1, 1953, $2000.00 on or before Oct. 1, 1954, $2000.00 on or before Oct. 1, 1955, and $2000.00 on or before Oct. 1, 1956, with interest at 4 per cent on all deferred payments. It is further directed that said sum be a lien on all the property of the defendant including the motel court and his bar property. Sec 28–2013 NDRC 1943. Upon payment of said sum plaintiff shall have no further interest in this property.

The trial court awarded plaintiff the sum of $100.00 as attor-

ney fee at the beginning of this action. The trial in district court occupied three days and on appeal two appearances have been made in the Supreme Court. We are of the opinion that the defendant should pay to the plaintiff an additional $500.00 for attorney fees and the taxable costs of this action in district court and on appeal.

The judgment of the district court is reversed and the case is remanded with direction to render judgment in accordance herewith.

MORRIS, C. J., and SATHRE, J., concur.

CHRISTIANSON, J. (Dissenting) I dissent.

Plaintiff brought this action for divorce against the defendant on the ground of extreme cruelty. The statute (NDRC 1943, 14-0505) declares "extreme cruelty is infliction by one party to the marriage of grievous bodily injury or grievous mental suffering upon the other." The defendant answered in denial and also by way of counterclaim alleged extreme cruelty on the part of plaintiff. After a prolonged trial and the examination of a large number of witnesses including both plaintiff and defendant all of whom appeared in person and testified before the court, the trial court found that the allegations of extreme cruelty were not proven by either side, also, that acts testified to by the plaintiff had been condoned and the court ordered a dismissal both of the complaint and of the counterclaim. The plaintiff appeals and asks for a trial anew in this Court. The original legislation providing for such appeal was enacted by the Legislative Assembly in the early history of the State. Laws 1893, Chapter 82. In Christianson et al v. Warehouse Association, 5 ND 438, 67 NW 300, 32 LRA 730, it was contended the statute was unconstitutional in this that it attempted "to confer upon this Court a jurisdiction not conemplated or permitted by the Constitution." This Court sustained the constitutionality of the act and in so doing considered what this Court was required to do under the statute. In its opinion in the case this Court said:

"Broadly stated, the objections urged against this law is

that it attempts to confer original jurisdiction upon this court, while, under the constitution, our jurisdiction is appellate only, except in certain specified cases." 5 ND at p 442.

"That statute says that this court 'shall try the case anew.' This language, it is apparent, was not used with exact accuracy. The case is not tried anew. There is no new evidence or any evidence adduced in this court. The case must be decided upon a record already prepared by a judicial tribunal. This court simply reviews the record, and the practical and necessary result of such review is to correct the errors, if any, either of the law or fact into which the court below may have fallen. . . . *The judgment of the trial court upon the facts must still have weight and influence with this court, especially when based upon the testimony of witnesses who appeared in person before that court.*" 5 ND at pp 443, 444. (Italics supplied)

The rule announced in Christianson et al v. Warehouse Association, supra, that on a trial de novo on appeal "the judgment of the trial court upon the facts must still have weight and influence with this court, especially when based upon the testimony of witnesses who appeared in person before that court," has been adhered to and applied by this Court in many subsequent cases. See Bingenheimer Mercantile Co. v. Sack, 50 ND 381, 385, 195 NW 969, 970; Doyle v. Doyle, 52 ND 380, 389, 202 NW 860, 863; Coykendall v. Briggs et al, 60 ND 267, 270, 234 NW 74, 75; Horner v. Horner, 66 ND 619, 620, 268 NW 428; Donovan v. Johnson, 67 ND 450, 455, 274 NW 124, 125; Buchanan v. Buchanan, 69 ND 208, 285 NW 75; Funk v. Baird, 72 ND 298, 309, 6 NW2d 569, 575; Klundt v. Pfeifle, 77 ND 132, 41 NW2d 416.

In Doyle v. Doyle, supra, this Court said:

"On a trial de novo the findings of the trial court are not clothed with the same presumptions in their favor as in other cases. But, on the other hand, in such a case as this, we must take into consideration the fact that we have here but a cold and lifeless record. We are called upon to determine the mental capacity, the state of mind, the knowledge and intent of Ellen Doyle at the time she executed and delivered the deed. We have not the advantage of seeing her, of noting her demeanor, of hearing her voice; of the innumerable intangible indicia that are so

valuable to a trial judge in determining questions of this character. The trial court had the advantage of all of these things and, breathing the air of the trial, he was in an immeasurably better position to find the real facts in the case. Therefore, notwithstanding that the case is here for trial de novo, we must give some appreciable weight to the determination of the trial court." 52 ND at p 389.

In Buchanan v. Buchanan, supra, this Court said:

"The means by which an appellate court may measure the credibility of witnesses are exceedingly limited. There are, however, many indicia of truth and falsity, of exaggeration and of recklessness in testimony, which enter into the atmosphere of a trial of this character and which can not be preserved for the benefit of a reviewing court. Of these, the trial judge had the benefit. His decision is entitled to appreciable weight." 69 ND at pp 209, 210.

In this case the judgment rendered by the trial court was based upon the testimony of the parties and witnesses who appeared in person before the court. The transcript of the testimony so taken occupies some 438 pages. There is conflict in the testimony as to the conduct of the defendant which forms the basis for the charge of extreme cruelty.

The plaintiff and defendant were married on January 25, 1947, both parties had been previously married to other persons and divorced. At the time of their marriage the plaintiff was 31 years of age. The record does not show the age of the defendant. The defendant had a son by the prior marriage who at the time of the trial was attending St. Thomas College and the defendant has been making substantial contribution to enable the son to pursue his studies at St. Thomas. It does not appear whether the plaintiff had any children by her previous marriage but apparently she did not. In the majority opinion reference is made to the building and operation of a motel by the parties at Mandan. The evidence shows that the construction of the present motel was commenced in 1948 and completed in 1949. One Johnson who built the motel testified that the defendant personally assisted in such construction. Such builder testified that in 1949 he commenced construction in the early

part of April 1949 and continued the work until the early part of October 1949. During this time the defendant was there and in addition to operating the motel assisted in the construction. The builder testified that at no time during such construction was the defendant under the influence of intoxicants. He testified that the defendant paid him his wages promptly each week.

A Mrs. Mann testified that she worked at the motel in cleaning and caring for the cabins from May 3, 1949, to September 9, 1949; that she worked in the afternoons; that the defendant was working at the motel and was nearly always there; and that during all this time she never saw him under the influence of intoxicants; that the plaintiff was seldom there and that on one occasion when she was there she had been drinking.

The manager of one of the principal lumberyards in Mandan testified that he sold building material for the motel to the defendant amounting in the aggregate to over $18,900; that all the arrangements were made with the defendant and that the bill for material was promptly paid; that the defendant in various dealings with him had always paid his bills and that he furnished the material to the defendant in confidence that payment would be made. The manager of the Mandan Sheet Metal Works testified that he sold and furnished certain material for the construction of the motel. He testified that the defendant's credit rating was excellent and that payment was promptly made for the supplies furnished. Similar testimony was given by the plumbing contractor. The plaintiff testified that she drew a sketch or plan of the motel and that she conferred with Johnson, the builder, about the construction; that he came to the house and discussed the matter with her and the defendant. Johnson, the builder, testified that he at no time discussed the matter with the plaintiff or talked to her at all. That he only saw her a couple times while the motel was being constructed, as she was going to or coming from the motel.

In the majority opinion reference is made to a statement alleged to have been made by the defendant concerning plaintiff's mother. The defendant denied that he made any such statement.

In the majority opinion reference is also made to an incident which is said to have occurred in July 1950 when it is said that the defendant slapped or struck the plaintiff. The evidence is to the effect that this incident happened after the plaintiff and defendant had returned from Bismarck where they had viewed a parade at the Elks'.Convention, that the plaintiff and the defendant and a man named Delzer, who had been doing.some concrete work at the motel, and his wife came to the home of the plaintiff and defendant in Mandan; that the men went to a bar and procurred some beer and that the four of them drank the beer; that thereupon the plaintiff and Mrs. Delzer went to obtain, and did obtain, some more beer. The defendant testified that they did not return promptly; that both he and Delzer telephoned them at the bar where they were but that they did not return and were gone about three hours. A maid who was present testified that when the plaintiff and Mrs. Delzer returned defendant complained because they had been absent so long. The plaintiff testified that the defendant struck her and called her a vile name. She further testified that this was the only time during their married life that he in any manner inflicted any personal injury on her. A maid who was present and was called as a witness by the plaintiff stated that the defendant slapped the plaintiff with the open hand. When plaintiff's counsel asked if he (defendant) gave her a black eye she answered " a little mark here." The testimony shows without dispute that later that evening all four went to the Dome, one of the night clubs between Bismarck and Mandan, and had dinner there; that thereafter plaintiff and defendant returned to their home; that the plaintiff and defendant continued to live together as husband and wife until shortly before Christmas; and that there was no serious quarrel between them from that time until shortly before Christmas when they had an argument concerning her expressed desire to go home for Christmas; that the plaintiff did go home for Christmas; and that the defendant went to see her and sought to have her come back home; that eventually she did come back about the latter part of December or the first of January; and that the plaintiff and defendant lived together as

husband and wife from the time the plaintiff returned about January 1, 1951, until August 24, 1951.

Reference is made in the majority opinion to a proposed agreement for condonation. This proposed agreement was prepared by defendant's counsel in an effort to obtain a reconciliation of the parties. Changes were made in an attempt to make the recitals agreeable to the plaintiff. A conference was had between plaintiff and defendant and defendant's counsel on September 12, 1951, and again on September 13, 1951. At the latter conference defendant signed the proposed agreement, plaintiff did not, but after defendant had signed the agreement she picked it up and put it in her purse. She stated that she would think it over and let him know at 10 or 11 o'clock the next morning. The plaintiff never came back and did not notify defendant as she had promised but kept the proposed agreement which he had signed and on September 19, 1951, brought this action for divorce and introduced the proposed agreement in evidence on the trial.

The status in life and sensibility of the parties are regarded as inevitable factors where the conduct complained of is the infliction of grievous mental suffering. 1 Nelson on Divorce, 2d ed, p 209. The decree of intelligence, refinement and delicacy of health and sentiment, are matters for the court to weigh with others in determining whether conduct complained of was cruel. 1 Nelson on Divorce, 2d ed, pp 242-263.

" 'Cruelty,' as ground for divorce, is a composite of cause and effect. It implies not only misconduct on the part of the spouse against whom a divorce is sought, but also injury to the mental or physical well-being of the one who seeks the relief." 1 Nelson on Divorce, 2d ed, p 234.

"The decisions defining mental cruelty employ such a variety of phraseology that it would be next to impossible to reproduce any generally accepted form. Very often, they do not purport to define it as distinct from physical cruelty, but combine both elements in a general definition of 'cruelty,' physical and mental. The generally recognized elements are:

(1) A course of abusive and humiliating treatment;

(2) Calculated or obviously of a nature to torture, discommode, or render miserable the life of the opposite spouse; and

(3) Actually affecting the physical or mental health of such spouse." 1 Nelson on Divorce, 2d ed, p 220.

The statute (NDRC 1943, 14–0505) declares "extreme cruelty is the infliction by one party to the marriage of grievous bodily injury or grievous mental suffering upon the other." Under this statute it is essential that the complaining party prove not only the acts, words and conduct of the other party to the marriage which he or she claims inflicted grievous bodily injury or grievous mental suffering, but must also prove that the acts, words or conduct complained of in fact did inflict grievous bodily injury and grievous mental suffering or both upon the complaining party. Mahnken v. Mahnken, 9 ND 188, 82 NW 872; Johnson v. Johnson, 46 ND 606, 180 NW 794; Johnson v. Johnson, 50 ND 696, 197 NW 773. In determining whether circumstances show extreme cruelty the court sitting as a trier of fact should keep in view the intelligence, apparent refinement and delicacy of sentiment of the complaining party. 1 Nelson on Divorce, 2d ed, p 209, pp 242–263; 17 Am Jur, Divorce and Separation( Sec 55, p 178; Thompson v. Thompson, 16 Wash2d 78, 132 Pac2d 734; Jackson v. Jackson, 70 RI 333, 38 Atl2d 637.

In its memorandum opinion the trial court said:

"On cross examination by defendant's counsel, she admitted that there was no serious trouble between them from January, 1951 up to the time she left in August, 1951 and that they lived and cohabited together during that period from January 1st, 1951 to August 25, 1951."

In its findings of fact the court said:

"That the plaintiff had left the defendant just before Christmas in 1950, that she returned to him during the holidays, and lived and co-habited with him from January 1st, 1951 to August 24th, 1951, when she left him and lived separate and apart from him; that from January 1st, 1951 up to the time she left him on August 24th of the said year, the parties did not have any serious trouble, and the Court finds that during said time the plaintiff with knowledge of the defendant's conduct towards her and all of the acts and things which she has complained of

condoned such acts and conduct of the defendant committed prior thereto, upon which she has relied for divorce upon the ground of extreme cruelty, and that the plaintiff and the defendant became reconciled and thereafter lived and co-habited together from January 1st, 1951 to August 24th, of said year when she left him to live separate and apart from him."

The fact that the plaintiff lived and cohabited with the defendant as his wife from January 1, 1951, to August 24, 1951, even though it does not amount to a legal condonation, does have a bearing upon whether the defendant had inflicted upon her grievous bodily injury or grievous mental suffering. It is hardly likely that she would have so lived and cohabited if the defendant had previously inflicted, or was then inflicting, upon her grievous bodily injury or grievous mental suffering. McKee v. McKee, 107 NJ Eq 1, 151 Atl 620; see, also, Maranto v. Maranto, 192 Md 214, 64 Atl2d 144.

In Mahnken v. Mahnken, supra, this Court said:

"It is claimed, and there is evidence in the record tending to show, that the language used by defendant towards his wife caused a nervous sickness on three several occasions, so serious that the visits of the family physician were necessary. We cannot, however, regard this as proven. The family physician who is also the family physician in plaintiff's father's family, testifies that he has no recollection of ever treating plaintiff for any nervous disorders, or ever treating her except at confinement, and that her general health is good. It is quite clear, we think, that the use of the offensive language did not inflict grievous bodily injury upon plaintiff. But under the later and better construction of statutes similar to ours it is held that the grievous mental suffering may be sufficient to warrant a divorce under the statute, and yet may be productive of no perceptible bodily injury. Barnes v. Barnes, 95 Cal 171, 30 Pac Rep 298, 16 LRA 660; Smith v. Smith, 119 Cal 183, 48 Pac Rep 730, 51 Pac Rep 183; Carpenter v. Carpenter, 30 Kan 744, 2 Pac 122. *But whether or not this grievous mental suffering has been inflicted in any particular case is purely a question of fact to be determined from a consideration of all the circumstances of the case, including the mental characteristics of the*

*party complaining so far as they may be developed.* Fleming v. Fleming, 95 Cal 430, 30 Pac Rep 566. *But it is very evident that courts here tread upon delicate, and perhaps uncertain grounds. The differences in mental characteristics are as varied as the difference in facial expression. The effect upon two minds of the same act or language may be entirely different, and the effect upon one may be incomprehensible to the other.* It is clear, then, that no standard can be erected, no measurements given, and no criterion established by which to gauge mental suffering. *This is a point upon which this court would be inclined to give much weight to the views of the trial court.* The complainant was before that court, and was examined at great length. All her mental characteristics would be much more apparent there than they can be from a study of the record. . . . We find no evidence in this case of the infliction of that grievous mental suffering that the law requires to justify the granting of a divorce. No doubt the language used by defendant would produce anger in a proud-spirited woman. But it is not for that cause that the marriage contract can be annulled. That contract, while it imposes upon the parties thereto the imperative obligation never to unnecessarily anger or wound each other, yet it also imposes the duty of forgiveness of all those weaknesses, imperfections, and peculiarities to which humanity is ever prone. . . . The statutory grounds for divorce in this state are broad, and courts may not multiply divorces by granting them in cases not clearly within the statute." 9 ND at pp 191, 192. (Italics supplied)

In Johnson v. Johnson, supra, the charge that the defendant inflicted grievous mental suffering upon the plaintiff was predicated largely upon evidence that the defendant had "exhibited to his wife lewd pictures, lascivious compositions, and paraphernalia evidencing a depraved moral nature, and that these acts or some of them took place at a time when, owing to the delicate condition of her health, she was subjected to extreme mental suffering on account thereof." In its opinion the Court said:

"It is not necessary in this opinion to describe the character of the matter so exhibited by the defendant. These acts deserve

the condemnation which counsel for the appellant has given them, but they do not necessarily amount to extreme cruelty. However much they are inclined to shock the moral sensibilities of persons of refinement, it is obvious that their effect in the particular case depends upon the manner in which they are received. The testimony of the plaintiff herself, aside from her direct statements, does not disclose that she was extremely shocked by these vile exhibitions. . . . There is nothing in the testimony of the plaintiff which evidences extreme shock at these matters. On the other hand, we would not be justified, from her testimony, in saying that she chose to live on the same moral plane as her husband. There is no reason to believe that this girl of tender years had so far abandoned her natural modesty and inherent feminine virtue as to initiate such indecent subjects of domestic intercourse; but it does not follow that they were necessarily so abhorrent to her as to cause grievous mental suffering. This depends so largely upon the sensibility of her moral nature, which could only be known to others as reflected by her presence and demeanor, that we who have only the cold record of the testimony are at a disadvantage. The trial judge, who had a superior opportunity to observe the parties and who held that obscenity of the character complained of might constitute extreme cruelty, did not feel warranted in finding that the plaintiff was shocked to the point of grievous mental suffering by the attitude and conduct of the defendant in relation to the matters that he exhibited to his wife. In the light of this record, we do not feel justified in overturning the findings of the trial court." 46 ND at pp 609, 610.

In Swanson v. Swanson, supra, this Court said:

"Whether the acts of the plaintiff have inflicted grievous mental suffering upon the defendant is a question of fact to be determined from all of the circumstances of the case. Mahnken v. Mahnken, 9 ND 188, 82 NW 870; Rindlaub v. Rindlaub, 19 ND 352, 125 NW 479. *In this case there is merely evidence of acts which it is now said caused grievous mental suffering. There is no direct evidence that the acts did cause such suffering.* Facts, of course, may justify inferences and certainly it is a legitimate inference in this case that plaintiff's acts did cause

the defendant annoyance and humiliation, but *whether they caused grievous mental suffering is another question.* Grievous means 'severe or intense.' Webster's International Dictionary."

Thorndike-Barnhart's Dictionary defines grievous as meaning "hard to bear; causing great pain or suffering; flagrant; atrocious."

In its findings of fact the trial court found:

"That the plaintiff failed to prove that the acts and conduct of the defendant has caused her grievous bodily injury, grievous mental suffering or that the defendant's conduct seriously impaired her health or endangered her life. It is true that plaintiff testified that the defendant's conduct caused her to have 'headaches' but there is no substantial corroboration that the defendant's acts and conduct caused her grievous mental suffering because her physical appearance, demeanor as she testified, and her actions at the time of the trial disclosed that she was apparently in the best of health."

In this case there is no evidence of any grievous bodily injury. 1 Nelson on Divorce, 2d ed, p 240; Thacker v. Thacker, 125 W Va 103, 23 SE2d 64; Johnson v. Johnson, 80 NH 15, 112 Atl 399. See, also, Johnson v. Johnson, 50 ND 696, 197 NW 773. Nor is it shown that any grievous mental suffering has been inflicted upon the plaintiff. The only evidence relating to plaintiff having headaches and taking medicine therefor is her own testimony which is wholly uncorroborated. Whether she had headaches, whether she took medicine and, if so, what medicine she took is not referred to in the testimony of any other witness. It appears from the testimony without dispute that in June 1949 the plaintiff went to the Quain and Ramstad Clinic at Bismarck for a medical examination or checkup; and that in September 1949 she went to Minneapolis for a medical examination. What the purpose of these examinations were is not shown. If her health had been adversely affected by the conduct of the defendant the medical testimony, if any, would have been available to her. She had available services of medical experts whose testimony could readily have been obtained either as a result of the examinations that had been made or upon further examination. The plaintiff testified that she was in good health and no longer had any

headaches, and as the trial court states in his findings her physical appearance and demeanor upon the trial disclosed that she was apparently in the best of health. The plaintiff was a woman of experience in life. She had operated a restaurant for some time and had assisted in operating a bar. There is nothing to indicate either frailty or unusual sensitiveness of character. There is nothing in her testimony to indicate that she was in any manner embarrassed or shocked or had been caused any mental suffering by the alleged misconduct of the defendant. She did not seem at all embarrassed in reciting the language which she attributed to the defendant and her testimony indicates rather a state of anger than one of grievous mental suffering because of what was said or done. What was said by this Court in Mahnken v. Mahnken, supra; Johnson v. Johnson, supra; and Swanson v. Swanson, supra, is applicable here. The trial judge who heard and saw these parties and their witnesses determined that the plaintiff had failed to establish that the defendant had inflicted upon her grievous bodily injury or grievous mental suffering. As pointed out in our former decisions the trial court was in a far better position than this Court to form an accurate judgment as to these matters, and this Court should "give much weight to the views of the trial court." (Mahnken v. Mahnken, supra.) The decision of the majority in this case ignores the views of the trial court.

The trial court found that a cause of action for divorce had not been established. Consequently the trial court made no determination concerning the division of the joint property. In view of the determination of the court that the evidence was insufficient to establish any "cause for which a divorce might be decreed" the trial court was without authority to make any determination concerning the division of the joint property. NDRC 1943, 14–0601, 14–0603; Mattson v. Mattson, ante, 381, 56 NW2d 764. Although evidence had been taken relating to the joint property all questions concerning the division of the joint property remained undetermined. Our laws provide:

"Upon an appeal from a judgment or order, the supreme court may reverse, affirm, or modify the judgment or order as to any and all of the parties, and if necessary or proper, may order a

new trial of the entire cause or of some specific issue or issues, . . . . *If, in the consideration of any appeal, it becomes apparent to the supreme court that some issue involved in the case has not been tried, or if tried has not been determined by the trial court, and that it is necessary or desirable to proper disposition of the case on appeal that such issue be determined, the supreme court may remand the case to the district court for the determination of such issue, without relinquishing jurisdiction of the appeal, and the supreme court may hold the determination of the appeal in abeyance until such issue has been determined by the trial court and the determination certified to the supreme court.* In such case the proceedings had and the determination made in the trial court, upon remand, shall be deemed part of the record on appeal in such cause." (Italics supplied) NDRC 1943, 28–2729.

In this case the question as to the division of the joint property was not determined by the trial court. The determination of that question was not merely a matter of computation, it involved the consideration and weighing of much evidence. The majority assume the power to decide all questions concerning the division of the joint property in the first instance and ignore the trial court which is vested "with power to determine in the first instance all questions of law and fact" in any such action. Upon the record here the question concerning the division of the joint property should not be determined by this court in the first instance, but the action should be remanded to the district court for adjudication and determination thereof by the trial court as prescribed by NDRC 1943, 28–2729.

BURKE, J. (dissenting). I concur in the dissenting opinion filed by Judge Christianson in so far as it holds that the trial court's finding that no cause of action for divorce has been established, should be sustained. It is my opinion that the judgment of the district court should be affirmed and a proper allowance decreed for the support of the plaintiff.