Lillian BEATON, Plaintiff and Appellant,

v.

Abel BEATON, Defendant and Respondent.

No. 7783.

Supreme Court of North Dakota.

Oct. 29, 1959.

Rehearing Denied Nov. 17, 1959.

Ella Van Berkom, Minot, for appellant.

Joseph P. Stevens, Minot, for respondent.

BURKE, Judge.

In this case plaintiff sued the defendant for a divorce. She alleged extreme cruelty. The defendant answered, denying the al- legations of plaintiff's complaint, and filed a counterclaim in which he also asked for a divorce on the ground of extreme cruelty. Upon trial the court found that neither party was entitled to a divorce and ordered the defendant to pay to the plaintiff, for separate maintenance the sum of $60 per month. Judgment was entered accordingly and plaintiff has appealed from the judg- ment. She has demanded a trial anew upon appeal.

Immediately subsequent to the judgment and before taking her appeal, plaintiff accepted two checks for $60 each, paid by the defendant, as required by the judgment for separate maintenance. Al- though upon taking her appeal plaintiff tendered repayment to the defendant of all the money so received, this circumstance has given rise to a motion to dismiss the appeal upon the ground that plaintiff ac- cepted the benefits of the judgment and thereby waived her right to appeal. The rule, that where a divorce is granted, a party who accepts substantial benefits un- der the judgment waives the right of ap- peal, has long been recognized in this state. Montgomery v. Montgomery, N.D., 88 N.W. 2d 104; Tuttle v. Tuttle, 19 N.D. 748, 124 N.W. 429; Boyle v. Boyle, 19 N.D. 522, 126 N.W. 229; Williams v. Williams, 6 N.D 269, 69 N.W. 47. The acceptance of an allowance for attorney's fees has been held to be the acceptance of a substantial benefit. Tuttle v. Tuttle, supra. The in- stant case is to be distinguished from the cited cases in that here no divorce or sep- aration from bed and board was granted. The trial court found that neither party had grounds for divorce and although separate maintenance was provided, the marriage status was left unimpaired. Ordinarily a husband is liable for the support of his wife. Secs. 14–0703, 14–0710, NDRC 1943. It is only under the circumstances set forth in Sec. 14–0711 NDRC 1943, that he is re- lieved of this obligation. The latter sec- tion provides:

"A husband abandoned by his wife is not liable for her support until she

offers to return, unless she was justified by his misconduct in abandoning him, nor is he liable for her support when she is living separate from him by agreement, unless such support is stipulated in the agreement."

The record in this case discloses, without question, that plaintiff did not leave her husband's home voluntarily, but that she was twice forcibly ejected therefrom. Upon the record the husband was not relieved of his statutory duty to support his wife. The judgment of the court, in decreeing that the husband should pay separate maintenance to his wife, did not create a liability against the husband, but in fact limited his statutory liability, which continued to exist. What the plaintiff accepted as a result of this judgment was certainly no more than she would have been entitled to as a matter of law, if the judgment had made no provision for separate maintenance.

■ The rule as to waiver "does not apply where the party claiming a review accepts a benefit which admittedly is due to such party, or accepts a benefit which would not be affected or be put in jeopardy by the review." 27A C.J.S. Divorce § 188, p. 786; Browning v. Browning, 208 Cal. 518, 282 P. 503; Afriat v. Afriat, 61 Nev. 321, 117 P.2d 83, 119 P.2d 883. We think it clear that the circumstances of this case conform to the exception to the rule and the motion to dismiss the appeal is therefore denied.

At the time plaintiff and defendant were married, on June 23, 1931, plaintiff had one child by a former marriage and defendant had five children. There were two children born to the plaintiff and the defendant. These children are married and have homes of their own. At the time of the marriage, defendant lived on a rented farm and his sole assets consisted of some cattle and farm machinery all of which were mortgaged. During their years together the parties acquired nine quarter sections of agricultural land and considerable personal property. One of the quarter sections was purchased by the plaintiff. She made the down payment with money she inherited from her mother. Subsequent payments were made from the proceeds of the sale of produce from the land. Title to this quarter section is in plaintiff's name and at the time of trial she still owed $1,000 on the purchase price. According to the evidence offered by the plaintiff the total assets of the parties are of the value of $115,000, their debts are $9,312 and their net worth is $105,748. This evidence is not controverted by any evidence offered on behalf of the defendant.

It is clear from the evidence, that since 1951, the relationship of the parties has been beset with much turbulence. Plaintiff had started a prior action for divorce in 1951 at the time defendant had taken an appointment as Deputy Sheriff of McHenry County. Sometime in the autumn of 1951, the parties effected a reconciliation, and plans were made to move the family to Towner, the County Seat of McHenry County. These plans never materialized. On December 6, 1951, plaintiff suffered a broken leg and other injuries in an automobile accident. As a result of these injuries she was hospitalized until March 5, 1952. After release from the hospital she remained in Minot until the middle of April when she returned to the farm home. The leg which was broken has remained weak and she continues to use crutches to aid her in walking. Her hospital and medical bills in the amount of approximately $5,000 were paid by her husband. Plaintiff received a settlement of $5,400 for the damage suffered in the accident and she refused to reimburse the defendant for his expenditures for the hospital and medical bills. She testified that she spent $2,000 of this money for an operation on her leg and the incidental medical and hospital costs, $600 to purchase a lot in Fargo for her son, $700 to pay her daughter for caring for her and keeping house during her convalescence, other sums for helping her son through college and for a trip

to Wisconsin to attend her brother's funeral. The balance was spent for her personal expenses to which the defendant made no contributions as long as the money lasted.

Plaintiff's allegations of mental cruelty concern defendant's association with a neighboring widow. Her allegations of bodily cruelty relate to incidents of claimed physical abuse. The last of these incidents occurred after this action was commenced and before trial. At the time of trial the complaint was amended to include the incident as an additional allegation of cruelty. On the other hand the defendant charges the plaintiff with constant nagging, the making of false charges of infidelity, and the driving of his relatives away from the farm home at the point of a gun.

The testimony of the parties is for the most part in conflict although each admits to an innocuous version of the acts testified to by the other. It is quite possible that due to the constant turmoil, which admittedly included angry and indelicate repartee on both sides, the acts of each became aggravated in the mind of the other and that the conflicts in the testimony are not due to a willful lack of veracity on the part of either. Out of the welter of conflicting testimony certain facts emerge as definitely established.

The neighboring widow lived with her 85 year old father upon a farm located about five miles from the farm occupied by the parties. The defendant, on occasions assisted in the farming operations of the widow and her father, he helped her care for her cattle, he hauled coal for her and took her to town to market. It is clear that defendant's anxiety for the welfare of the widow and her father exceeded, to some extent at least, the "good neighbor policy" which he claimed actuated his conduct. He knew that his wife objected strenuously to this association, that she strongly suspected that an amorous attachment had arisen between the defendant and the widow. Yet he made no attempt to subdue "the green eyed monster" by discontinuing his program of assistance. On the contrary, he persisted in it openly, knowing full well it could only aggravate the continuing quarrel at home. Three letters from the widow to the defendant were introduced in evidence. These letters show that the camaraderie which existed between the widow and the defendant was such that she felt free to make derisive references to his wife. For instance, in one letter she wrote, "she has been acting the abused part. Weeps and says she is a helpless cripple, will be for life and you can guess the rest, sickening eh? I'll surely miss you and I hope you get the job. I'll keep on the alert, too, so write. I do not care to mail this letter at Deering. I am sending this to Seattle and have it mailed to you there. * * *"

The letter was part of a correspondence that the defendant carried on with the widow while on a trip to the West Coast in the fall of 1956. During his several weeks absence on this trip defendant did not write to the plaintiff at all. In the fall of 1957, plaintiff's jealousy had been fanned to such a heat that she issued an ultimatum to the defendant. She told him that the next time he went to the widow's farm she would lock him out. The defendant accepted the challenge and plaintiff made good on her threat. When she discovered that defendant had gone again to the widow's farm, she padlocked the house and went to town. When she returned home that evening she found that defendant had broken into the house. He refused to allow her to enter the home. Plaintiff then went to Deering, returned with a deputy sheriff and demanded admittance. Defendant again refused to let her in. He told her to go and stay with her relatives. According to plaintiff this direction was punctuated with profanity. According to the defendant it was not.

After this action was commenced plaintiff again attempted to return home. She

said she thought that defendant might have cooled down sufficiently to allow her to return. This time defendant allowed her to enter, but told her to be gone by the time he had finished the evening chores. When defendant returned from doing the evening chores plaintiff was still in the house. In the testimony there are two directly contradictory versions of the incidents which followed. Defendant said that, when he returned, plaintiff was sitting on the floor, that he grabbed her around the waist from behind and carried her or dragged her out of the house. He denied that he struck her. The plaintiff testified that when defendant returned to the house, she was sitting in a rocking chair in the living room; that defendant "tore" her out of the chair to the floor; that he told her to get up and when she was slow in getting up, because of her disability, he kicked her; that he twisted one arm behind her and struck her; that she believes she lost consciousness and the next thing she remembers is that she was sitting on the floor of the porch with her coat thrown over her head. She returned to Minot and immediately entered a hospital where she remained for seven days. Her physician testified that she was brought to Trinity Hospital with multiple bruises about her body; that she was there for several days and was treated by him. According to defendant's own testimony he ceased to cohabit with the plaintiff as husband and wife in 1953.

On defendant's side of the ledger, it may be stated that plaintiff did accuse him of improper association with other women, that she scolded him on frequent occasions, and that she discussed her suspicions of his infidelity with her acquaintances. The testimony as to the allegation that plaintiff drove some of his relatives away from the home at the point of a gun is pure hearsay. Defendant testified that the incident was related to him in a long distance telephone call from his sister. Since this testimony was not objected to, it is properly in the record.

However, it remains subject to the disability that, as to the fact in issue, it is an unsworn statement. In our judgment therefore it should not be given credence over the sworn denial of the plaintiff. We also consider it established that plaintiff has done little to assist the defendant since she was injured in 1951, except to contribute $1,500, which she received from a sister, to the installation of a bathroom in the farm home. Prior to 1951 she had been industrious and frugal.

■ Upon this record each party asks for a divorce upon the ground of extreme cruelty. Extreme cruelty is the infliction of grievous bodily injury or grievous mental suffering. Section 14–0505 NDRC 1943. Plaintiff asserts that her cause has been established by proof of physical abuse which caused grievous bodily injury and by proof of conduct on the part of the defendant both towards herself and with respect to other women which caused her mental anguish or grievous mental suffering. On the other hand the defendant claims proof of constant nagging and charges of infidelity which caused him grievous mental suffering.

■ We find in this case that the preponderance of the evidence is in favor of the plaintiff. False charges of infidelity, constantly repeated may inflict grievous mental suffering. Fleck v. Fleck, 79 N.D. 561, 58 N.W.2d 765; Ruff v. Ruff, 78 N.D. 775, 52 N.W.2d 107. However, where the husband's acts are such that the wife had reasonable grounds to believe, and did believe, that charges of infidelity were true, the making of the charges alone will not constitute a ground for divorce. Ruff v. Ruff, supra. And the evidence of husband's conduct may be considered with other evidence in evaluating the wife's charges of mental cruelty. Ruff v. Ruff, supra. Here we think it clear that the defendant had lost all interest in the plaintiff, that he lived as a stranger in the family home and that he, knowingly and willfully, persisted in

a course of conduct which reasonably caused his wife to believe that he was being unfaithful. In addition he subjected her to physical abuse, which on one occasion caused multiple bodily bruises for which she was treated in a hospital for seven days. The facts in this case are similar to, but more aggravated than, the facts in the case of Ruff v. Ruff, supra. In the latter case we said (78 N.D. 782, 52 N.W.2d 110):

"The evidence of physical violence is restricted to two occasions already referred to. Evidence concerning mental cruelty is much more positive and extensive. We have already outlined the proof with respect to plaintiff's conduct with women other than the defendant which, while not sufficient to establish adultery, was ample to cause the defendant apprehension, worry, and humiliation. This conduct is entitled to be considered in connection with evidence of other conduct on the part of the plaintiff tending to support defendant's allegation of grievous mental suffering. There is no question that the defendant over considerable period of time suffered ill treatment at the hands of the plaintiff which grew progressively worse. According to his own testimony, he ceased to cohabit with her as husband and wife some eight months prior to the commencement of the action. On June 21, 1950, the plaintiff told his wife that he was taking her to her mother's place in Elgin and that she was to stay there forever. She stayed with her mother overnight and came back to the Ruff home the following evening. The plaintiff was away and the house was locked. When the plaintiff came home about one a. m. he admitted her to the house and she stayed until morning.

He again took her to her mother's place."

Upon the above statement this court found that the defendant wife in the Ruff case had established a cause of action for divorce. The parallel between that case and the instant case is striking, the principal difference between the two being that Ruff did treat his wife with more consideration than did the defendant in the instant case. Upon the record we find that the plaintiff, Lillian Beaton has established extreme cruelty as a ground for divorce and that she is entitled to a decree.

We are also satisfied that the property acquired by the parties between the time of the marriage and the commencement of this action, whether held jointly or individually, should be divided equally between them. Since the major portion of this property consists of widely separated tracts of real estate, we are of the opinion that we should not attempt to select and allocate specific tracts to the parties without first giving them an opportunity to agree on a division. There may be choices which are personal to the parties which will not conflict. If possible these choices and the reasons for them should be given consideration. The case is therefore remanded to the District Court with directions to enter a decree of divorce in favor of the plaintiff and against the defendant and to enter a decree for the equal distribution of the property of the parties either upon the stipulation of the parties or in the event the parties fail to agree within thirty days after the filing of the remittitur herein, after a hearing upon a motion for such distribution which may be noticed by either party.

SATHRE, C. J., and MORRIS, J., concur.