**Albert BOLT, Plaintiff and Respondent,**

v.

**Verla BOLT, Defendant and Appellant.**

No. 8122.

Supreme Court of North Dakota.

April 15, 1965.

Cox, Pearce, Engebretson, Murray, Atkinson & Gunnass, Bismarck, for plaintiff and respondent.

C. J. Schauss, Mandan, for defendant and appellant.

STRUTZ, Judge.

This is an action brought by Albert Bolt against Verla Bolt for divorce. The ground for divorce, as alleged by the plaintiff, is extreme cruelty.

The defendant denied any acts on her part constituting cruelty. She filed a counterclaim alleging acts which she contended constituted extreme cruelty on the part of the plaintiff, and she demanded an absolute divorce on such counterclaim. She further prayed for an equitable property settlement, for attorney fees and expenses, and for temporary and permanent alimony.

The trial court ordered judgment in favor of the plaintiff for a divorce, denying the defendant any relief. From the judgment entered upon such order the defendant has appealed, demanding a trial de novo.

Upon trial de novo on appeal, the Supreme Court must ascertain the facts from the record and, in making its determination, the findings of the trial court are to be given appreciable weight. Agrest v. Agrest, 75 N.D. 318, 27 N.W.2d 697; Belt v. Belt, 75 N.D. 723, 32 N.W.2d 674.

We must therefore, turn to the record to determine what the facts in this case really are.

The plaintiff and the defendant were married on September 11, 1959, both parties having previously been married. It appears that the marriage was one of convenience, the plaintiff desiring the defendant to act as his housekeeper while the defendant desired the plaintiff's companionship because she had been lonely.

Following their marriage, the parties went to Mandan to live, where the plaintiff was employed at an oil refinery at a salary in excess of $12,000 a year. The defendant had been left in fairly comfortable circumstances by her first husband. The undisputed evidence discloses that she had stocks and bonds, of the approximate value of $75,000, on which she realized an income of about $300 a month. She admits that, prior to the marriage, she had agreed that she would pay her share of the household expenses.

The plaintiff had a son by his former marriage, who was fourteen years of age. It is obvious from the testimony that this boy felt offended by the presence of the defendant in the family, for he stated that he resented her presence in the home.

Difficulties soon arose which strained marital ties to the breaking point. During the first year, the defendant deposited most of her income in a joint account with the plaintiff. After a time, however, she wanted to know what this money was being used for, but the plaintiff declined to give her any satisfactory information on how the money was being spent.

Dissension also arose over the son. In any disagreement which the defendant had with the boy, the plaintiff always sided with his son. This young man had an unfortunate habit of delaying his homework

until morning, and then he would get up at five o'clock to prepare his lessons for the day. The defendant requested him not to disturb her at such an early hour because she needed her rest. She was told by the plaintiff that if she didn't like it she could move to the basement where the activities of the boy would not disturb her. As a result, the defendant moved to a basement room, about two and one-half months after the marriage of the parties, and she continued to occupy that room until she left the home in June of 1962.

The record further discloses that, during the first year of the marriage, the defendant deposited approximately $2,500 in the joint account. However, when the plaintiff refused to give her any explanation of the use of the money, she discontinued such deposits. She admits that she, herself, had used between five and six hundred dollars of the money from this account. The plaintiff evidently resented the fact that these deposits were being discontinued, for the defendant testified that she was told by the plaintiff that she could leave if she did not turn her money over to him. That this testimony is probably true is seen from the written demands made by the plaintiff upon the defendant. He presented her with an "agreement" which he had prepared and which he requested her to sign. By the terms of this so-called agreement, which is in evidence, the defendant was to agree that she would contribute not less than one-third of her annual income to the support of the family by giving such money to the plaintiff; that she would agree to pay all of her personal expenses within the limits of her income, including doctor, hospital, and nursing bills, hairdresser expenses, clothing costs, and income taxes; and that she would further agree to pay for

"domestic help if required due to my inability to perform the usual duties connected with housekeeping, cooking, etc."

In this so-called agreement, the defendant was further asked to pay one-third of the cost of any vacations which might be taken by the plaintiff, his son, and the defendant, and one-half of the costs for any trips taken by the plaintiff and the defendant alone. Finally, she was to agree that her funeral expenses would be paid out of her own estate before distribution, and that she would relieve the plaintiff of any liability for such payment.

The defendant refused to sign the proposed agreement when it was presented to her by the plaintiff.

The record further discloses that the defendant was in rather poor health, although the record does not disclose the nature of her illness. On one occasion, while she was visiting her daughter in Denver, she went to a doctor. She was advised that she should submit to surgery, so she called the plaintiff to inform him and to get his consent for the operation. The plaintiff at first agreed, but later wired the doctor refusing to give his approval, and the operation was postponed. The defendant later had the necessary surgery performed in Kansas City, paying for it out of her own funds. Thereafter, the plaintiff filed a claim for such hospital and medical expenses with an insurance company from which he had secured a family medical policy. He collected $651.45 on such claim, which sum he kept for his own use and did not reimburse the defendant for moneys which she had expended for such hospitalization, which totaled about one thousand dollars.

The defendant finally moved out of the home of the parties in June of 1962, while the plaintiff and his son were on a trip to Wyoming.

■ The judges who heard this case, and who join in this opinion, have considered and weighed the evidence which is summarized above. Giving due weight to the trial court's findings, we have reached the conclusion that the evidence does not warrant a finding of extreme cruelty on the part of the defendant toward the plaintiff. The "numerous acts constituting mental

cruelty" which are alleged in the plaintiff's complaint are related in the following testimony:

"Q What were these acts?

"A Lot of them. They were small but really hard on me. The first one she complained about was my walking up town. My business is sedentary. I need exercise. When I came home she jumped on me something awful.

"Q Did this happen just once?

"A Yes. I told her it was going to continue.

"Q Any other thing?

"A Another thing, she hollered about was my boy going out in the garage and looking in a box."

Again, we read:

"Q What other things?

"A She complained about the boy getting up early to study.

"Q Did these things happen frequently or were they isolated instances?

"A Hardly. I would say frequently. I never knew when I would come home from work what was going to happen next."

 While a course of conduct may constitute cruelty and inhuman treatment, isolated acts are insufficient to render the plaintiff's situation intolerable. The policy of the law is to conserve the stability of the marriage relationship and to grant no divorce except upon clear proof, adequately corroborated, of facts required by our law. Our courts have a great concern that the home be preserved wherever possible and that the marriage relationship be protected, for it is a relationship that is fostered by religion, maintained by society, and therefore should be protected by law. Easy divorce should be frowned upon.

The plaintiff bolstered the allegations of his complaint by testifying:

"A One day in Bismarck when we were shopping. She objected to walking to the parking lot. So I went and got the car and when I drove back she wasn't there. I spent about two hours looking for her. I was about to call 'Missing Persons' when she showed up at home.

"Q Did that have any effect on you?

"A Very definitely."

It will be noted that the plaintiff did not explain that the reason the defendant "objected to walking to the parking lot" was because, at that time, she had a broken leg which was in a cast, and that she was on crutches.

 Some point is made of the fact that the defendant told the plaintiff that she was three or four years younger than she really was, and that this fact caused him great mental suffering. The defendant explained this by saying that she really believed herself to be younger than her birth certificate later showed her to be. But we feel that this is immaterial. Certainly the mere fact that a woman gives her age as a few years younger than it really is, when the parties reach the point in life that these parties have reached, should not be considered such cruelty as to be a ground for divorce.

We are agreed that the evidence does not warrant or sustain the finding of the trial court of extreme cruelty on the part of the defendant, nor does it warrant the granting of a divorce to the plaintiff.

The defendant has counterclaimed for divorce, also on the ground of cruelty. What evidence does the record present to sustain her allegations of cruelty?

She testified that, several weeks after the marriage, she complained about the son getting up at five in the morning to study,

thereby disturbing her rest. When she objected to such conduct, she was told by the plaintiff that if she didn't like it she could sleep in the basement. From that time on, her room was in the basement. She further testified that, shortly after the marriage, she suffered a broken leg and had the leg in a cast up to her knee. She testified that she was on crutches for two or three months, but continued to sleep in the basement although it was very difficult getting up and down the stairs in her condition.

The record further shows that, after the defendant had deposited approximately $2,-500 in the joint account during the first year, she told the plaintiff, "I never see the bank statement." She wanted to know where the money was going, but the plaintiff refused to give her any information and she thereupon stopped putting anything into the account. The plaintiff's own testimony corroborates the defendant's story on this point, for he testified:

"She started putting all her money in a joint bank account. Then along about April she started a separate account and put one-third in the joint account and two-thirds in her own."

After starting the separate account of her own, and after she stopped putting money in the joint account, she testified:

"I paid all my own expense. I bought clothes, paid medical expense and even bought the boy some clothes."

When they were on trips together, she paid her part of the expense, for she testified:

"A Yes, for the hotel or motel. Even if we would go into a restaurant I paid for my meals."

She further testified:

"A I was treated like a servant. I washed, ironed, cooked for them. I even ironed their socks. * *"

Again, she testified:

"A He told me I could just as well move out if I didn't turn my money over to him."

The difficulty between the parties, according to the defendant, was money. She testified:

"A It was mainly money. He wanted my money. After the action was started he still wanted my money."

We believe the evidence of the defendant on her cross-complaint is sufficient to justify the granting of a divorce. It is crystal clear, from the testimony in the record and from the agreement which plaintiff requested the defendant to sign, that the plaintiff's only interest in the defendant was her money and her work as a housekeeper, and that he was not in the least interested in her as a wife. The continued indignity of being treated as a maid in the home is, we believe, sufficient to constitute extreme cruelty. It is further evident, from the record, that there is not a remote possibility that a reconciliation could be effected and that the parties could live happily together in the future. The plaintiff's conduct, during most of the time the parties resided together, was such that his entire attitude toward the defendant was insulting and belittling, and made life intolerable for her.

On the theory that the defendant was merely a servant and a maid rather than a wife, she attempted to show the value of her services to the plaintiff. The court, however, sustained the plaintiff's objection to such testimony. We do not believe she is entitled to a maid's wages. She was, after all, the wife of the plaintiff—not his servant—even though she may have been treated as a servant.

The judgment granting the plaintiff a divorce is reversed, and the defendant is granted a divorce on her counterclaim. She is not awarded any money as salary, but the defendant is awarded judgment in the sum of $651.45, the amount which the

plaintiff collected on the hospital and medical insurance policy for the defendant's illness, although the defendant had paid all of the doctor and hospital bills for such illness out of her own funds.

The defendant contends that the record shows that the plaintiff improved his financial standing and that he increased his net worth by some $10,000 during the marriage, and that she should be awarded one-half of this amount. The trial court obviously felt that, even though the plaintiff's financial condition had improved during the marriage, the defendant has ample resources and, in view of the condition of the plaintiff's health, the court, in its discretion, refused to allow the defendant any part of the increase in the net worth of the plaintiff.

■ This court has the power, upon trial de novo, to make a division of property, to award alimony and support money, and to base such award on the needs of the one party and the ability of the other to pay. The plaintiff here has the ability to pay. He has a salary in excess of $1,000 a month. But the record also shows that the plaintiff is in poor health. He has a son to educate. The record further shows that the defendant has an estate of approximately $75,000, which is ample to care for her needs. We therefore hold that the defendant is not entitled to alimony and support money or to a division of the increased net worth of the plaintiff during the marriage, except as hereinbefore provided.

■ All of the property which the defendant acquired prior to the marriage remains her separate property, however. Fleck v. Fleck, 79 N.D. 561, 58 N.W.2d 765.

The defendant is further awarded costs and disbursements, plus attorney fees in the district court and on this appeal in the sum of $750.

Judgment is reversed and remanded with instructions to enter judgment in conformity herewith.

BURKE, C. J., and ERICKSTAD and TEIGEN, JJ., concur.

KNUDSON, J., not having been a member of this Court at the time of the submission of the case, did not participate.